Docusign Envelope ID: 1B632CC9-FFD2-4B98-8D83-261A2E13F54E

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-01100-SKC-KAS

EVERETT BEN MARTINEZ,

    Plaintiff

  v.

CITY AND COUNTY OF DENVER,

MICHIKO "MIKO" BROWN, DENVER CITY ATTORNEY,
    In her official and individual capacities,

NICOLE DOHENY, CHIEF FINANCIAL OFFICER FOR THE CITY,
    In her official and individual capacities, and

JEFF DOLAN, CHIEF STRATEGIST FOR THE MAYOR OF DENVER
    In his official and individual capacities.

    Defendants.

---

**FIRST AMENDED VERIFIED COMPLAINT AND REQUEST FOR JURY TRIAL**

---

Plaintiff Everett Martinez [Martinez or Plaintiff or Plaintiff Martinez] , through his attorneys, Steven L. Murray of Murray Law, LLC, and Andrea F. Sobel and Brandon Armitage of Sobel Law, LLC, submits his First Amended Verified Complaint and Request for Jury Trial against Defendants, the City and County of Denver; Miko Brown, Denver City Attorney, in her individual and official capacities; Nicole Doheny, Chief Financial Officer for the City, in her individual and official capacities; and Jeff Dolan, Chief Strategist for the Mayor, in his individual and official capacities.

Plaintiff Martinez is the General Counsel and Executive Vice President of Denver International Airport. [Airport or DIA]. The City has employed Martinez for over nine years. He has served as

1

General Counsel since 2022.

This is an employment retaliation and discrimination case. Martinez alleges claims for retaliation under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. Section 1983, racial discrimination under the Equal Protection Clause of the Fourteenth Amendment, and retaliation under the False Claims Act.

## I.  SUMMARY OF CASE

1.  Martinez supervises an in-house team referred to as DEN Legal.

2.  Martinez's employment is protected under the Denver Career Service program. He is not a political appointee.

3.  Martinez is (1) forty-six years of age, (2) Hispanic and Latino, and (3) a Colorado native. He has lived in Colorado his entire life, except for law school.

4.  Martinez has sterling legal credentials. He graduated from Harvard Law School. During his career with the City, he consistently earned positive or outstanding performance evaluations.

5.  Martinez was recognized as "Best General Counsel" to the Airport by former DEN Chief of Staff and Former Deputy City Attorney, Cristal Tores DeHerrera, in her time with the City, which spanned three DEN general counsels, in a performance evaluation.

6.  Martinez was appointed by then-Mayor Michael B. Hancock and the City Council of Denver, jointly, as their choice for the seat on the Denver Board of Ethics designated to be selected by the Mayor and the Council, in 2022.

7.  Martinez holds the Certified Member (CM) designation from the American Association of Airport Executives, reflecting specialized knowledge of airport operations and regulatory requirements.

8.  This case has two related parts.

9. **Part One.** The Mayor's office, through Doheny, Dolan, and Brown disagreed with Martinez, (1) who in the course of advising Airport leadership, Martinez communicated, his legal analysis, objections and warnings and sound legal advice to the Airport regarding serious legal problems with the Mayor's Park Hill Golf Course Land Swap deal in which the City exchanged Airport land in exchange for a private developer's golf course land, and his sound legal advice on the legal and financial risks of the City's action denying a lease to Key Lime Air; and (2) about his specific objections and warnings ~~to the City~~ of the potential of legal and severe economic/financial penalties from violating federal law over the Airport's real estate transactions under the Federal Aviation Administration's jurisdiction [FAA];

10. The Mayor's office, through Doheny, Dolan, and Brown disagreed with Martinez, who in the course of advising Airport leadership, disagreed with Martinez's refusal to engage in unethical and/or unlawful conduct when he refused to: (1) follow the Defendants' directive to conceal a material fact from the FAA; (2) not keep records regarding the real estate deal, (2) direct his Airport team not to keep records regarding the real estate deal; (3) join with Brown, Doheny, and Dolan to "take care of " of Washington, the Chief Executive Officer of DIA, and (4) act to fabricate an investigation based on a false reason to present to the FAA as justification for the City's action on the Key Lime airlines airport lease.

11. Following or contemporaneous with Martinez's above actions, the City retaliated against him by (1) denying him a pay raise and upward job reclassification of his Executive Vice President position, which was recommended by Washington, Mike Nakornkhet, the former Chief Financial Officer for the Airport, and Michael Biel, the current Chief Financial Officer of the Airport, which would have increased his annual compensation by about $50,000.00; (2) disparaging and criticizing him professionally and personally to an outside attorney with whom he had an established professional relationship; (3) addressing him with a racist trope by telling him to get noose and hang himself with

3

it; (4) telling him he has no credibility and he's "full of shit'; (5) repeatedly accusing him of sabotaging and obstructing the Park Hill real estate deal; (6) repeatedly telling him he had to make things right with Doheny and Dolan and to admit the wrong he had done; essentially telling him to admit, in writing, that in the course of advising Airport leadership, Martinez communicated, his legal analysis, objections and warnings and sound legal advice to the Airport and is doing so, his legal opinions, counsel, and advice on the real estate deal were wrong; (7) disclosing a private attorney-client privileged communication from him to Washington, to a political appointee in the Mayor's office, and (8) undermining his authority by meeting with outside counsel and excluding Martinez and his team members on the Airport's legal staff.

12.     **Part Two**. On or about January 13, 2026, Martinez began formally challenging the treatment he was receiving from the Defendants by filing a complaint with the City's Office of Human Resources. [OHR].

13.     Martinez then retained Steven Murray and Murray Law, LLC, as his attorney.

14.     On February 20, 2026, Martinez's attorney submitted a letter to Brown, Doheny, Dolan and OHR setting forth Martinez's constitutional claims under the First and Fourteenth Amendments, including his claims for retaliation and race discrimination, Title VII of the Civil Rights Act of 1964 as amended, [Title VII], and the Colorado Anti-Discrimination, as amended [CADA], and the False Claims Act.

15.     On March 9, 2026, Martinez's attorney sent two documents to the City.

16.     The March 9 attorney submissions documents again raised Martinez's constitutional claims, his claims for race discrimination and retaliation, and the specific laws prohibiting retaliation against him for the protected activity of hiring an attorney and asserting claims.

17.     On March 11, 2026, two days after the last attorney document was submitted to the City,

the City placed Martinez on administrative leave and told him he could no longer serve as General Counsel.

18. The City informed him he had three options: (1) resign, (2) be removed, or (3) be declared disqualified.

19. The City's stated rationale: Martinez had taken an interest adverse to the City, he had an attorney-client relationship with the City, and he was now conflicted and <u>could</u> no longer serve as General Counsel.

20. In Martinez's years as an attorney, including his time as Assistant General Counsel and General Counsel, he had never been advised by any City Attorney, Deputy or Assistant City Attorney, any Airport leader or officer, or any political appointee of any Mayor, (1) he had an attorney-client relationship with the City, (2) he did not have an attorney-client client relationship with the Airport, (3) he did not have an attorney-client privilege with the Airport that only the Airport can waive, or (4) that the way he performed his duties under his understanding of his attorney client relationship with the Airport, not with the City, and the Airport related attorney client privilege, was in any way incorrect or needed to change.

21. Martinez has not taken any adverse interest to the City: (1) Martinez filed an OHR complaint, and (2) his attorney sent three documents to the City identifying his constitutional and other legal claims and warning the City against retaliation.

22. The above actions did not create a conflict of interest; instead, Martinez exercised his rights that are protected under the First Amendment, Fourteenth Amendment, Title VII, CADA, and the False Claims Act, as well as countless federal and state employment discrimination and retaliation statutes in the country.

23. The initial Complaint and Request for Jury Trial was filed on March 18, 2026. [ECF Doc

1]. The initial complaint asserted four First and Fourteenth Amendment retaliation claims, one claim for race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, and one retaliation claim under the False Claims Act.

24. Almost immediately after Martinez filed his lawsuit, the City, on March 18, 2026, submitted a statement to Denver local media in which it asserted Martinez had violated his attorney-client privilege in making statements in his Complaint.

25. After Martinez filed his lawsuit, the City, on or about March 19, 2026, changed Martinez's status from administrative leave to investigative leave. The terms of the investigatory leave are highly restrictive, retaliatory, and punitive.

26. The terms of the leave direct him not to discuss this matter with any other City and County of Denver employees, to refrain from contacting and/or speaking to anyone at the City and County of Denver regarding this matter or work-related matters unless first given permission from your supervisor, and shall remain at home during normal business hours and you shall perform work that is assigned to you by your supervisor, as needed.

## II. **PARTIES**

27. Martinez is a United States citizen and resident of Adams County, Colorado.

28. The City and County of Denver is a municipal government entity.

29. Miko Brown, a female, is the Denver City Attorney.

30. Nicole Doheny is the Chief Financial Officer for the City.

31. Jeff Dolan is the Chief Strategist for the Mayor.

32. Martinez asserts his constitutional claims against Brown, Doheny, and Dolan in their individual and official capacities.

33. Martinez, Brown, Doheny, and Dolan are employed by the City. At all relevant times, they

6

worked within this Court's Judicial District.

34.     Brown, Doheny, and Dolan are political appointees of Denver Mayor Johnston.

35.     Martinez's employment is protected under the Denver Career Service program, laws, statutes, and rules. He is not a political appointee.

36.     The City, Martinez, Brown, Doheny, and Dolan are persons under 42 U.S.C. §§ 1981 and 1983.

### III.     JURISDICTION AND VENUE

37.     Jurisdiction is asserted under 42 U.S.C. §§ 1983 and 1988; 28 U.S.C. §§ 1331 and 1343(a)(3)– (4), and the First and Fourteenth Amendments to the United States Constitution.

38.     All claims arose in this Judicial District. Venue is proper under 28 U.S.C. §§ 1391(a)(1), (b)(1)– (2), (c)(2), and 42 U.S.C. § 2000e-5(f)(3).

### IV.     GENERAL ALLEGATIONS

#### A.     Martinez's General Counsel Role

39.     Phil Washington is the Airport's CEO. Washington is a Black man. He is a political appointee, having been appointed by former Mayor Hancock.

40.     As General Counsel, Martinez's salary comes entirely from the Airport's Enterprise Fund, an account separate from the City's General Fund.

41.     Under federal law, every dollar of airport revenue must be used exclusively for the Airport's capital or operating costs. 49 U.S.C. §§ 47107(b), 47133.

42.     The Airport operates as a federally obligated airport subject to FAA sponsor obligations.

43.     Throughout Martinez's nearly ten-year tenure as an Airport attorney, his legal work was directed to the Airport's leadership and operational needs, airport business matters, and the Airport's compliance obligations under federal airport laws.

47. Because Martinez is paid from the Enterprise Fund, his attorney-client relationship runs to the Airport and its leadership, and therefore, his attorney-client relationship is not with the City or the Mayor's political appointees.

48. Martinez has a duty of loyalty to the Airport and its leadership and therefore owes independent judgment to the Airport and its leadership.

49. Martinez's professional responsibility required him to provide independent legal advice to the Airport leadership regarding compliance with federal airport law and FAA sponsor obligations.

50. At all times, Martinez has provided honest, well-reasoned legal advice consistent with the Colorado Rules of Professional Conduct.

**B.** **Park Hill Golf Course Land Swap**

51. In May 2024, Martinez learned the Mayor's Office wanted to swap Airport land for the Park Hill Golf Course.

52. Martinez did not oppose the concept of the Park Hill real estate deal.

53. Martinez's role as General Counsel to the Airport was to advise the Airport on legal requirements governing the transaction and to ensure that any transaction complied with federal airport laws and FAA sponsor obligations.

54. Throughout 2024-2025, in the course of advising Airport leadership, Martinez communicated, his legal analysis, objections and warnings to the Airport, which he communicated to City officials, including Dolan, Doheny and others, identifying enforcement and financial risks for the Airport and City under the FAA's Federal Aviation Administration's [FAA] enforcement authority and related statutes and regulations associated with the proposed Park Hill real estate deal.

55. Martinez, in the course of advising Airport leadership, communicated, his legal analysis, objections and warnings to the Airport, which he also communicated in meetings attended by City

Officials, including Dolan, Doheny, Kerry Tipper, the former City attorney, Katie McLaughlin, the Acting City Attorney after Tipper left, and Brown, the current City attorney, regarding federal requirements and the risks associated with the proposed transaction and communicated the severe penalties involved for not following those requirements.

56. Deanne Durfee, the City's former Director of Municipal Operations, who is an attorney, told Martinez the deal was impossible but asked for his opinion. Martinez agreed with Durfee because he found that the transaction was likely a textbook revenue diversion, a third-rail concern for the FAA.

57. Durfee told Martinez the Mayor wanted the deal to be closed by his first State of the City speech, set to take place on July 22, 2024.

58. The Intergovernmental Agreement governing the Airport establishes a cooperative framework among Denver and surrounding jurisdictions to regulate land use, development, and compatibility in areas affected by airport operations.

59. Durfee and Martinez discussed whether the Intergovernmental Agreement could restrict or condition the sale of airport land, including whether it would require approval of the parties or only allow for long-term leasing structures, which they believed it did, and they both understood the agreement to impose constraints on the ability to transfer airport land without such prior approvals.

C. **FAA Revenue Diversion Rule**

60. The FAA's revenue diversion rule provides that if a city that owns an airport cannot take money or value from it for non-airport purposes.

61. 49 U.S.C. § 47107(b) conditions federal grant eligibility on the City's assurance that airport revenues will be used exclusively for airport purposes. Also, 49 U.S.C. § 47133 imposes the same obligation directly on the City, the sponsor, independent of any grant agreement.

62. Denver International Airport receives hundreds of millions of dollars in federal funding

from the FAA. When the FAA provides these funds, the City, the airport sponsor, must agree to a set of legally binding promises known as Airport Sponsor Grant Assurances.

63. These grant assurances require the City, as the airport sponsor, to operate the airport in compliance with federal aviation law and to protect airport property and airport revenue, so they are used for airport purposes. See 49 U.S.C. §§ 47107, 47133; FAA Airport Sponsor Grant Assurances.

64. As General Counsel for Airport, Martinez's responsibilities included advising Airport leadership regarding compliance with these federal requirements and ensuring that transactions involving airport property complied with FAA grant assurances and federal aviation law.

65. Because the Airport receives these federal funds, the Airport must follow strict federal rules governing the use of airport land and airport revenue.

66. First, there can be no revenue diversion. Federal law prohibits airport property or airport revenue from being used for non-airport purposes unless strict conditions are met.

67. Airport land and airport revenue must remain dedicated to airport purposes. They cannot be used for unrelated government projects or other non-airport purposes unless the airport itself receives fair market value in return. See 49 U.S.C. § 47133; FAA Revenue Use Policy, 64 Fed. Reg. 7696 (1999).

68. Second, if airport land is transferred or used for another purpose, the transaction must be structured as an arm's-length transaction, meaning it must reflect normal market conditions between independent parties and accurately reflect the true value of the land. See FAA Order 5190.6B §15.9.

69. Third, federal rules require that an airport receives fair market value if airport land is sold or used for non-airport purposes. Transferring airport property for less than its fair market value may constitute revenue diversion. See FAA Grant Assurance 25; FAA Order 5190.6B.

70. Fourth, the FAA must approve the release of airport land for non-airport purposes. If airport

10

land is proposed to be used for a non-airport purpose, the airport sponsor must obtain FAA approval through a formal land release process.

71.    As part of that process, which is called the Form 743 process, the FAA evaluates whether the proposed transaction complies with federal requirements, including the prohibition on revenue diversion, the arm's-length transaction requirement, and the requirement that the airport receive fair market value. See 49 U.S.C. § 47107(h); FAA Order 5190.6B Ch. 22.

72.    Fifth, the FAA requires full transparency regarding transactions involving airport property. Because the FAA relies on information provided by airport sponsors when evaluating compliance with federal requirements, the agency requires complete and accurate disclosure of the facts surrounding transactions involving airport land. Failure to provide accurate information may expose the airport sponsor to federal enforcement action. See FAA Order 5190.6B.

73.    In the event these federal requirements are violated, the FAA may impose significant enforcement consequences. These may include loss of eligibility for federal airport grants, withholding of federal funding, repayment of improperly diverted airport revenue with interest, and substantial civil penalties under federal aviation law.

74.    In some circumstances, the financial exposure associated with these remedies may significantly exceed the amount of the diverted revenue itself. See 49 U.S.C. §§ 47111, 47133, 46301.

75.    Because the FAA strictly enforces these requirements, discouraging or removing the Airport's Counsel for raising compliance concerns creates a serious risk that regulatory issues affecting the Airport could go unaddressed. *See* 49 U.S.C. §§ 47111.

76.    Martinez has a professional and legal duty to monitor, identify, and address potential revenue diversions and violations of FAA rules and statutes under its jurisdiction.

**D.    Mayor's Appointees Push the Park Hill Land Swap Deal**

77. In the spring and summer of 2024, Doheny and Dolan began holding meetings to take action to close the land swap deal.

78. Martinez met with his legal team, Airport officials, and employees. They analyzed the legal risks, the revenue diversion issues, and what lawful justification, if any, the City could offer the FAA for acquiring a golf course, which was the City's initial directive.

79. Martinez had extensive discussions with Kaplan Kirsch, a law firm frequently retained by the Airport as outside counsel. The Kaplan Firm is a nationally recognized expert in airport law.

80. At no time did the Kaplan Firm advise Martinez that his legal opinion or advice regarding the real estate deal was wrong.

81. Martinez communicated to Dolan, in the course of advising the Airport that the Intergovernmental Agreement ("IGA") might require a public vote or a waiver, and not to follow the IGA could expose the City and Airport to political and financial consequences of great importance.

82. In response to Martinez's warning, to Martinez's knowledge, the City took no action to initiate a public vote or obtain a waiver of the IGA provisions.

83. Doheny and Dolan decided the Airport would sell its land to the City via an internal book transfer, and the City would immediately swap it to the developer.

**E. The Required FAA Form 743 Process**

84. When a federally obligated airport proposes to dispose of airport land or transfer property interest, the FAA typically requires submission of FAA Form 743.

85. In submitting this form, the Airport must confirm the deal complies with grant assurances, meaning the Airport receives fair market value, the proceeds of the sale remain with the Airport, and there is no diversion of revenue of the sale to the City for non-Airport purposes.

86. In October 2024, David Steinberger, an attorney on Martinez's team, submitted the first Form 743.

87. Before filing the required Form 743, Martinez and Steinberger warned Airport leadership, and communicated to Dolan and Doheny their objection in submitting the Form 743 at that time because there was no parcel identified at the time, which made the submission premature and created a risk of providing the FAA with incorrect and inaccurate information.

88. Defendants ignored the Airport legal teams' objections and warnings to Airport leadership, which had been communicated to Dolan and Doheny. Doheny directed Steinberger to file the Form 743 anyway.

89. Before the above event, during Martinez's nearly ten-year career as an attorney for the Airport, no political appointee of any Mayor ever directed any member of the Airport legal team to file a Form 743 to initiate the FAA approval process, when Airport counsel advised the political appointee that the Form 743 may be viewed by the FAA as having incorrect and inaccurate information.

90. Throughout this period, Martinez spoke regularly with Kerry Tipper, the former City Attorney. He communicated, in the course of advising the Airport, the revenue diversion risks and IGA risks. He explained he and his team felt increasing pressure from Doheny and Dolan.

**F. The Concealment Directive**

91. Doheny, Dolan, and their team structured the transaction so that the Airport would transfer land to the City, and the City would immediately hand it to the developer, Westside Investment Partners.

92. Tipper, the former City Attorney, told Martinez to tell Washington that the Mayor preferred the FAA not be told about the private developer's involvement.

93. Beginning in the summer of 2025, Doheny told Washington, Steinberger, and Martinez, more than once: "The Mayor does not want FAA to know about the Westside step." The Westside

step was the plan of the City to immediately transfer the airport land to a private developer upon the airport's transfer to the City.

94. Martinez refused to follow the Mayor's, Doheny's, and Tipper's directive to conceal material information from the FAA.

95. Before the above event, during Martinez's nearly ten-year career as an attorney for the Airport, no political appointee of any Mayor, including no City Attorney or attorney in the City Attorney's Office, ever directed any member of the Airport leadership or any member of Airport legal team to conceal any fact or event in any form in submitting information to the FAA.

### G. The Mayor's Premature Announcement

96. On January 15, 2025, the Mayor held a press conference at the Park Hill Golf Course and announced the City had acquired it.

97. The Mayor's announcement was premature because at this point, the Purchase and Sale Agreement had not been signed, the FAA process was not finished, and the City Council had not voted on the deal.

98. Meanwhile, Tipper took maternity leave and left the City.

99. McLaughlin became Acting City Attorney. She began attending meetings on the golf course land swap deal.

100. McLaughlin held meetings with the Kaplan firm without telling Martinez or Steinberger.

101. This action risked damaging their credibility with the firm and prevented them from obtaining all relevant information which they were legally responsible for managing.

102. During Martinez's nearly ten years with the Airport as an attorney, he had never witnessed any City Attorney, Acting City Attorney, or Assistant City Attorney interfering or intervening in the Airport attorneys' relationships with outside counsel.

14

**H.  The Below-Market Appraisal**

103.  A central part of the Form 743 process is whether the Airport received fair market value in an arm's-length transaction.

104.  The City did two appraisals. The Airport did one.

105.  Doheny and her team controlled the appraisals.

106.  Doheny and her team did not involve the Airport in her appraisals, despite the Airport having conducted a prior appraisal of the very land ultimately sold in this transaction, which was delivered to the FAA in 2020.

107.  In 2020, the Airport told the FAA the land was worth $3.25 per square foot.

108.  The City's appraisals came in at $1.70 in 2024 and $1.65 in 2025, an approximate 50% reduction in value.

109.  The difference between the 2020 appraisal and the subsequent appraisals conducted solely by the City raised concerns for Martinez about whether the transaction would satisfy FAA fair market valuation requirements and be viewed as an arm's-length transaction.

110.  Doheny was not concerned with the prior appraisal or Martinez's explanations, in the course of advising the Airport and communicating with City officials, the penalties associated with a transaction below fair market value.

111.  Doheny told Martinez: "The [Airport] is a place, not a thing, under the City. And I am the CFO of the city; we own that land, and it's my call."

112.  Martinez, in the course of advising the Airport, communicated to Doheny (1) the federal government did not see it the same way; (2) the FAA treats the Airport as a distinct entity; and (3) the revenue diversion rule, (including the need for the Airport to receive fair market value in an arms-length transaction) is serious, and violations carry the risk of enormous financial sanctions.

15

113. Doheny and her colleagues ignored Martinez's communications.

114. During Martinez's nearly ten years with the Airport as an attorney, no political appointee of any Mayor, including none of Doheny's predecessors as the City's Chief Financial Officer, had ever ignored the warnings and objections of the Airport legal team that a real estate transaction was one in which the Airport would not receive fair market value, or ignored the Airport's appraisal of the land in issue, in favor or City generated appraisal under which the Airport would receive less value from the land than under the Airport's appraisal.

## I.   City Directive Not to Keep Records of Land Deal

115. On August 6, 2025, McLaughlin called Martinez at his home at 7:09 p.m. She directed him and his team not to keep records of the real estate transaction. She stated, "Keeping records would scream treble damages to the FAA."

116. Martinez documented the call.

117. Martinez immediately called Steinberger, Kevin Cain, another attorney on his team, and Washington. He told them to keep records of everything. Later, he told his entire team: if anyone, including himself, ever tells them not to keep a record, which is exactly when they should keep records.

118. During Martinez's nearly ten years with the Airport as an attorney, no political appointee of any Mayor, nor any City Attorney or Acting City attorney, including none of Doheny's predecessors as the City's Chief Financial Officer, had directed him or any member of the Airport legal team or Airport leadership, not to keep records of any transaction, deal, project, or any matter which they were working on and had responsibilities.

## J.   The 20-Acre Expansion

121. City Council approved a 145-acre swap in May 2025. Later, the developer demanded 20

16

more acres.

122. On August 19–20, 2025, Martinez and Steinberger told McLaughlin the additional 20 acres required separate Council approval, per the City Charter.

123. City Council never approved the additional 20 acres provided to the developer.

124. During Martinez's nearly ten years with the Airport as an attorney, no political appointee of any Mayor, had proceeded ahead on a part of a real estate deal and not obtained City Council approval of the part of the deal when the Airport legal team had objected and warned the appointee that the specific part of the deal must be approved by City Council.

### K. Martinez's Application for City Attorney Position & Non-selection

125. Martinez applied for the open City Attorney position.

126. A panel interviewed Martinez on July 18, 2025. Dolan was present even though he was not on the panel.

127. After the initial interview, Martinez advanced as one of the final three candidates for the position.

128. Martinez interviewed with the Mayor and Jenn Ridder, the Mayor's then Chief of Staff. She has returned to this postion after taking leave.

129. Martinez used this interview to raise the alarm that the situation at the Airport was serious and needed to be fixed, as Doheny's relationship with Washington was harming the business operations at the Airport, and the attorneys [Steinberger and Martinez] were tasked with dealing with the fallout thereof.

130. In the interview, Mayor Johnston asked Martinez how to fix the problem between Washington, Doheny, and Dolan.

131. Martinez provided the same explanation he had with Dolan, Tipper, Doheny, and

McLaughlin: they needed to sit down and discuss their differences and no longer use lawyers as pawns in their battle.

132. On July 30, Ridder told Martinez he was not selected. She added: "The Mayor wanted [you] to specifically know that we are aware of all of the help you have provided to Jeff (Dolan) and Nicole (Doheny) at the Airport."

133. Brown became City Attorney on September 1, 2025.

134. Four days later, on September 5, 2025, Martinez sent Brown a comprehensive memorandum regarding the legal issues involving the Park Hill real estate deal and his concerns. Steinberger followed with a second memorandum to Brown on September 8, 2025.

**L.** **City Denies Martinez's Recommended Pay Raise & Job Reclassification**

135. On April 7, 2024, the Airport CEO and prior CFO recommended promoting Martinez from EX-21 to EX-22. The current CFO confirmed this on December 22, 2025.

136. In September 2025, McLaughlin, Brown, and the City denied Martinez a pay raise and a reclassification of his position as Executive Vice President, a role he holds in addition to his General Counsel position.

137. The pay raise and reclassification have been recommended by (1) Washington, the CEO of the Airport, (2) the former Chief Financial Officer for the Airport, and (3) the current Chief Financial Officer for the Airport, as his clients, and as his compensation is paid entirely out of the Airport's Enterprise Fund.

138. Martinez raised the issue with Dolan on August 12 and 27, and September 2, 2025.

139. Every other EVP at the Airport is classified as EX-22. Martinez is the only EVP not classified as EX-22.

140. The pay gap is approximately $ 50,000.00 per year.

141. The average EVP salary in 2024 was $273,337. Martinez's 2026 salary is $225,358.56.

142. The City denied Martinez's recommended pay raise and reclassification without any explanation.

M. **Disparagement & Sabotage & Obstruction Accusations**

143. Starting in September 2025, right after Brown became City Attorney, she began retaliating and discriminating against Martinez.

144. On September 19, 2025, Martinez received a call from Peter Kirsch of the Kaplan Firm.

145. Kirsch told Martinez that Doheny had called and asked him to "yell at" Martinez about his advice to the Airport, that it was necessary to complete an additional Form 743 to account for the additional 20 acres.

146. Mr. Kirsch also told Martinez that Doheny made "outrageous accusations" about Martinez "personally."

147. Martinez has a long-established, professional, and supportive relationship with Mr. Kirsch.

130. Throughout the events in dispute, Mr. Kirsch has supported the quality and accuracy of Martinez's legal advice and well-reasoned opinions.

148. Martinez complained to Brown about Doheny's conduct.

149. Brown refused to address Doheny's behavior. Instead, she was upset with Mr. Kirsch, the outside lawyer, because he had told Martinez about Doheny's comments.

150. Martinez complained to Brown that two of his attorneys overheard her speaking to Dolan the previous week, during which Dolan stated: **"[Martinez and Steinberger] are actively sabotaging this transaction, and Mike (the Mayor) has taken notice."**

151. When Martinez confronted Brown, she first denied it; then she called Steinberger an

"obstructionist" and said she was "not quite at the point of getting rid of him yet," and that "Martinez was being lumped in with Phil Washington and the Airport."

152. From that point on, at every meeting but one, Brown told Martinez: "You and David [Steinberger] need to fix the relationship with [Dolan and Doheny]. If you don't, something is going to happen."

153. Martinez understood Brown's statement as a threat to his employment.

**N.** **The FAA Responds**

154. On October 18, 2025, local media reported on the land deal.

155. The FAA took notice and contacted Washington by telephone, and the Airport's Chief Operations Officer.

156. The FAA's Airport District Office warned that future grants were at risk because: (1) the City's immediate transfer of the original 165 acres to the private developer, without notifying the FAA of the ultimate owner, and (2) the proposed yet-to-be-approved additional 20-acre transfer being discussed in the media as completed, but without FAA approval.

157. The FAA also discovered that Steinberger had sent the original Form 743 to the wrong email address. Martinez was not aware of the mistake until this time.

158. Martinez notified Brown that the FAA had contacted the Airport and informed its leadership that future grants might be at risk after the FAA discovered the secondary transfer to the third-party developer and an additional transfer of 20 acres, only through the media.

159. Brown replied: "Well, they [Doheny and Dolan] can't say you didn't warn them."

160. The next day, Brown changed her position and blamed Martinez for the FAA questioning the real estate swap. She told him: "You and David [Steinberger] should have done a better job communicating the risk to [Doheny and Dolan]."

161. At this point, Brown emailed Martinez and Washington, demanding to be included in all FAA discussions going forward, along with Dolan and Doheny. This directive threatened to compromise the attorney-client relationship between Martinez, Washington, and the Airport.

162. In all of Martinez's years as an attorney for the Airport, no City Attorney, Acting City Attorney, or Deputy City Attorney had made a demand to be involved in a relationship or transaction that could jeopardize the attorney-client relationship between the Airport legal team and the Airport leadership.

## O.     The City Attorney Leadership Retreats

163. At a retreat on October 31, 2025, a colleague jokingly asked if the Mayor wanted to "fire everyone." Brown looked directly at Martinez. "Actually, I'm sure there's a few people he'd love to get rid of."

164. At another retreat, she spent over an hour publicly berating a Director of a section of the City Attorney's Office in front of her fellow directors until the Director was in tears, curled up in a near fetal position.

## P.     Key Lime Airlines

165. In late December 2025, the City Council rejected an ordinance to lease space to Key Lime Air, a small airline at the airport. The Council opposed Key Lime's lease because the airline transported individuals, on behalf of the Trump Administration, who were subject to deportation based on their immigration status.

166. Before the Council's decision, the Airport legal team advised the Council of the FAA's position that discrimination against an airline is only permissible for safety reasons.

167. The Council recognized and confirmed receiving the Airport legal team's advice, through their own counsel, during their public vote. With this information, the Council voted against the lease.

21

168. On January 6, 2026, Washington, Martinez, and other senior officials at the Airport met with Brown.

169. During this meeting, Brown asked the Airport leadership, "Do you all investigate airlines for safety violations?"

170. The SVP of Airline Affairs said that the Airport does not as it is a function of the FAA, not an airport.

171. Brown replied, "Well you all should investigate Key Lime yourselves."

172. Martinez opposed this directive stating it was very clear during their public statements on their "no" vote that the reason the Council voted "no" was because of the deportation issue.

173. Brown replied, "If the FAA comes knocking, I want to be able to have in my back pocket that [the] Council was also voting [no] because of safety issues, but [they] ran out of time to get to talking about that before voting."

174. After the meeting, Martinez informed his team and Airport leadership that the action Brown was proposing was illegal and described the action as fabricating evidence to give to the FAA.

175. In a meeting on or about January 12, 2026, Steinberger restated Brown's prior directive to begin investigating Key Lime for safety reasons.

176. Everyone on the DEN Legal team [Airport Legal Team] and Senior officials of the Airport all agreed with Martinez: what Brown was discussing and directing was highly illegal, and to have that other safety reason in "our back pocket," as Brown put it, was wholly inappropriate and illegal, and they should not follow her directive.

**Q.    FAA Scrutiny**

177. On December 31, 2025, the FAA submitted a letter to Washington. The FAA states:

The Federal Aviation Administration (FAA) is writing to express concerns

22

regarding the recent action taken by the Denver City Council in regard to City Council Bill 1938 to deny approval of a proposed airport lease for **Key Lime Air Corporation** at Denver International Airport. Based on information currently available to the FAA, the stated rationale for the lease denial appears to be unrelated to airport operational, safety, or capacity considerations and instead is based on opposition to the tenant's aeronautical activities. [Emphasis supplied].

**R.   Events After FAA Notice**

178.   On January 2, 2026, Emily Garnett, the Mayor's Acting Chief of Staff, contacted Martinez to tell him Council President Amanda Sandoval wanted to speak with him following a discussion among Garnett, Sandoval, and Angela Casias, the Mayor's Legislative Director, about the implications of the no vote.

179.   On Saturday, January 3, 2026, Sandoval called Martinez and asked a few questions about FAA Grant Assurance 22, which prevents discrimination against air carriers, and for some literature explaining the grant assurance program.

180.   Martinez told Sandoval he read the transcript of the Council's vote and related discussion. Martinez, in the course of advising the Airport and explaining Airport compliance risks to the Airport leadership, communicated his understanding; voting down an airline agreement for any non-safety reason would be an enormous problem, and it seemed some Council members thought voting no would cost the Airport only a single grant, which was not correct.

181.   Martinez emphasized the action could cost the City all grants going forward.

182.   Sandoval asked Martinez about the amount of money in issue. Martinez replied, "That's for [City] Finance and Nicole Doheny to answer. I can only guess, and we have been told by Miko [Brown] that if we think Nicole would want to be involved in a matter, we need to make that known."

183.   Brown had given the directive about Doheny's involvement to the entire City Attorney's

23

Office in a town hall call.

S. **January 8–9, 2026: Retaliation & Discrimination**

184. On January 8 and 9, 2026, Brown's retaliation and discrimination against Martinez reached a critical point.

185. In a meeting with Martinez, Brown told Martinez: (1) he had "zero credibility," and (2) he was "full of shit," (3) at least four times: "Maybe this isn't the place for you."

186. Martinez interpreted Brown's statements as threats.

187. Brown demanded that Martinez "come clean" to Dolan and Doheny, in writing, about "all the wrong you have done." Brown's demand for him to "come clean" was a demand that he falsely confess his opinions, objections, warnings, and advice on the real estate deal to Washington being wrong or improper, as it went against the desires of the Mayor's office. Outside FAA counsel retained by the Airport had confirmed Martinez's opinions were correct.

188. Brown waved around what she called a "mystery email" in which Martinez had supposedly offered to "kill the deal," referencing the real estate deal. Brown did not show him the email in the meeting. She provided him with the email one month later, in February 2026.

189. Regarding the Park Hill land swap deal, Martinez never offered "to kill the deal" or took action to "kill the deal".

190. The email Brown referenced in the meeting was written a year and a half before Brown was hired. Brown misinterpreted the email. The email instead reflects Martinez's advice to Washington on how to protect the Airport from a transaction that likely violated federal law and involved a parcel of land entirely different from the one used in the Park Hill real estate deal. This function, consulting Washington as the leading official in Airport leadership, is a central part of his job.

191. Brown admitted she had given the email to Dolan, and Dolan "has it on his computer, right

now." In doing so, Brown took a privileged attorney-client communication between Martinez and Washington, the Airport's CEO, and handed it to Dolan, a political operative, to use against Martinez, the attorney who wrote the document.

192. Brown stated, "if you don't do this [come clean in writing to Doheny and Dolan], I will formally discipline you for this email we found in December" [referring to the legal advice I provided to Washington in June of 2024].

193. Brown then stated: "If you can get on board with Dolan, Doheny, and me, **then we can take care of [Washington] together."**

194. Brown ended the meeting by telling Martinez, **"or get a noose and hang yourself with it,"** if he did not want to get **"on board"** with their plan to **"take care of" Washington."**

T.     **Martinez's Human Resources Complaint & Subsequent Events**

195. On January 13, 2026, Martinez submitted a written complaint to the Office of Human Resources [OHR] in which he notified the Executive Director of OHR and the City Attorney's Office Representative to OHR that Brown and the Mayor's Office were retaliating against him and were looking for a reason to get rid of him.

196. Martinez's OHR complaint addressed these issues: (1) the City's directive to conceal material facts from FAA Sponsor-controlled appraisal and valuation override; (2) the City's instruction not to create or retain records; (3) the City's dispute with the FAA requirement to submit a Second Form 743 and the related dispute and political pressure; (4) the City's private communications with airport outside counsel; (5) the Brown–Dolan call referencing the Mayor and making allegations of sabotage and obstructions by Martinez; (6) Brown's Key Lime Airlines Directive, and Key Lime investigation; and (7) the City's interference with Airport outside counsel and reputational harm.

197. Brown accused Martinez of poor management of Steinberger on matters regarding Park

25

Hill and Key Lime Airlines.

198. Brown held meetings with Steinberger, directing him to again tell the Airport leadership to investigate the safety record of the airline as a post hoc reason to give to the FAA for the City Council's no vote. Brown excluded Martinez from these meetings, but later she blamed him for failing to supervise Steinberger on the Key Lime matter.

199. After Martinez filed his OHR complaint on January 13, 2026, the City, under Brown's leadership of the City Attorney's office, gave Martinez the lowest evaluation of his career. This was the first time he received a "development needed" rating on a performance evaluation element.

200. In this meeting on February 11, 2026, Brown, in the presence of Brown's Deputy City Attorney, again raised the issue of Martinez needed to "come clean" in writing, and alleging Martinez did not support Brown's directive to the Airport and Martinez's team to investigate Key Lime Air, post hoc, as a stated reason to give to the FAA for the City Council's no vote. This meeting took place a month after Brown knew about the OHR complaint.

201. On February 18, 2026, the Director of Human Resources told Martinez that he would be separated from direct contact with Brown because Brown "had lost her mind" in reference to a February 11, 2026, meeting Martinez had with Brown.

202. Despite those assurances, Brown scheduled a one-on-one with Martinez in March 2026.

**U.** **February 20, 2026 - March 11, 2026: Removal of Martinez as General Counsel**

203. On February 20, 2026, Martinez's attorney submitted a letter to Brown, Doheny, Dolan, and OHR. The letter made these points:

> (1) Mr. Martinez has several compelling legal claims against the City and County of Denver and City officials (elected or otherwise), in their individual capacities, including

Ms. Brown, Ms. Doheny, and Mr. Dolan.

(2) Mr. Martinez's claims include, but are not limited to, claims under these statutes and provisions:

(a) Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 [Title VII].

(b) Colorado Anti-Discrimination Act, as amended, C.R.S. §§ 24-34-401 to 406 [CADA].

(c) Discrimination claims under 42 U.S.C. § 1981, to be asserted under 42 U.S.C. § 1983.

(d) Claims for violations under the First and Fourteenth Amendments of the United States Constitution, to be asserted under 42 U.S.C. Section 1983.

(e) Whistleblower protections under the Federal Aviation Administration.

204. The February 20, 2026, letter made these points:

(1) The City's retaliation against Martinez is unlawful.

(2) This statement is protected activity under Title VII, CADA, Section 1981, and the First Amendment of the United States Constitution.

(3) The above provisions prohibit the City and City officials, supervisors, managers, and employees from retaliating against Martinez for submitting his claims herein.

(4) This statement is protected activity and may be used in future proceedings against the City and City officials.

205. The City's HR department retained an outside attorney regarding the investigation of Martinez's OHR complaint.

206. On March 9, 2026, Martinez's attorney submitted two documents to the attorney retained

by the City to investigate Martinez's OHR complaint, (1) a letter outlining Martinez's claims and (2) a comprehensive position statement with legal authority and exhibits.

207.   In the March 9 comprehensive position statement, Martinez attorney notified Defendants of Martinez's claims under (1) Title VII of the Civil Rights Act of 1964, as amended, [Title VII], 42 U.S.C.§§ 2000e–2000e-17,  (2) the First Amendment of the United States Constitution, (3) the Equal Protection Clause of the Fourteenth Amendment, (4) the Colorado Anti-Discrimination Act, as amended [CADA], and C.R.S. §§ 24- 34-401 to 406, (5)  42 U.S.C. § 1981 [Section 1981], asserted through Section 1983, and (6) the False Claims Act, 31 U.S.C. §§ 3729–3733.

208.   Also, the March 9 comprehensive position statement explained that the above statutes prohibited the City, Brown, Doheny, and Dolan, and City officials, supervisors, managers, and employees from continuing to retaliate against Martinez for submitting his claims herein.

209.   In addition, the March 9 comprehensive position statement explained that the documents were protected activity under the above statutes and may be used in future proceedings against the City and the named individual officials for unlawful retaliation.

210.   The March 9 letter explained that Martinez had the following viable claims he could assert in the United States District Court anytime, without any government immunity notice or exhaustion of remedies: (1) 42 U.S.C. §1983: [First Amendment Retaliation], City and Individual Officer Liability; (2) 42 U.S.C. §1983: [Race/Ethnic Discrimination: Fourteenth Amendment], City and Individual Officer Liability, (3) 42 U.S.C. §1983: [Retaliation: Fourteenth Amendment], City and Individual Officer Liability, and (4) False Claims Act. 31 U.S.C. §§ 3729–3733, Multiple Claims, including Retaliation, City and Individual Officer Liability.

211.   On March 11, 2026, two days after Martinez's second submission on March 9, 2026,

28

the City took extreme, harmful action against him.

212. Kathryn Smith, the Acting Deputy City Attorney, and Laura Colbrun, the HR Director, met with Martinez and told him:

(1) Martinez could no longer serve as General Counsel.

(2) Martinez had an attorney-client relationship with the City.

(3) They referred to the Airport's employees as "his clients," and told him not to contact them. This statement is inconsistent with their assertion he had an attorney-client relationship with the City.

(4) [Smith told him]: "You know that you have had some matters that have been raised against the City."

(5) Martinez had taken an adverse interest against the City, and he must withdraw from representation, meaning he could no longer hold the General Counsel position.

(6) The City placed Martinez on administrative leave for seven days, and if he did not resign, the City would remove him as General Counsel or disqualify him.

213. Until Martinez raised these legal concerns and reported them internally, no one had suggested that his role as General Counsel to the Airport posed any conflict that would prevent me from performing his duties.

214. This was the first time the City claimed that asserting legal rights or reporting misconduct created a conflict preventing Martinez from serving as General Counsel.

215. Throughout Martinez's career, his legal work has been directed toward the Airport and its leadership regarding federal airport law compliance and airport operations.

216. Throughout Martinez's career as an Airport attorney, he has always operated and performed his duties with the sound understanding that he has an attorney-client relationship with the

29

Airport.

217. Based on Martinez's performance as an Airport attorney practicing and having an attorney-client relationship with the Airport, and not the City, the City selected Martinez as General Counsel.

218. As General Counsel, Martinez has earned outstanding performance ratings and a recommendation for a pay raise and reclassification to a higher position, with his attorney-client relationship with the Airport known.

219. At no point during Martinez's nine years with the Airport was Martinez ever told that asserting legal rights as an employee or reporting legal concerns would disqualify him from serving as General Counsel. The first time the City asserted that Martinez's legal claims created a conflict of interest was after he submitted his complaint to OHR and after his attorney notified the City of potential legal claims.

220. Defendants' actions were intentional, malicious, willful, and in reckless disregard of Martinez's federally protected rights.

221. As a direct result of the Defendants' conduct, Martinez (1) has suffered emotional pain, suffering, mental anguish, humiliation, and loss of enjoyment of life, and (2) stands on the brink of losing wages, lost wages, income, Martinez's earning capacity, retirement contributions, and future monetary losses.

222. The Defendants' adverse employment actions against Martinez, described above and below, would deter a reasonable person from exercising his protected First Amendment rights of expression and association on matters of public concern, and his right to petition the government for redress on such matters.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM
### First Amendment Retaliation
### [Martinez's Expression & Conduct re: Matters of Public Concern]
### [May 2024 – January 13, 2026]

223.   Martinez incorporates and realleges all prior allegations in the Complaint.

224.   Martinez brings this claim under the First and Fourteenth Amendments of the United States Constitution and U.S.C. § 1983.

225.   The First Amendment protects a local government employee's right to expression and speech on matters of public concern.

226.   The First Amendment protects an employee's right to refuse to act in/on a matter of public concern.

227.   A local government employer may no more punish an employee for refusing to carry out an unlawful directive than it may punish the employee for speaking out against an unlawful directive.

228.   From May 2024 through January 2026, Martinez engaged in forms of expression protected by the First Amendment.

229.   Martinez, in the course of advising Airport leadership, and provided his legal analysis, objections and warnings and sound legal advice to the Airport, and in addition, communicated to Defendants, under the protections of constitutionally protected speech and conduct as a citizen on matters of public concern: the integrity of a major international airport's dealings with the federal agency responsible for aviation safety and funding, and the potential for severe legal and catastrophic penalties for the City and Airport for violating the FAA administered laws, rules, and regulations.

31

230. Martinez's communications to the Defendants were outside his official duties.

231. Martinez's regular duties required him to advise the Airport leadership on airport legal issues, however, his duties did not involve communicating to and confronting the Mayor's appointed officials before, after, and during their decision making and actions regarding the Park Hill real estate deal ~~swap~~ and the Key Lime Airlines matters without complying with FAA mandatory requirements, thereby exposing the Airport and City to legal risks and potential financial penalties.

232. Martinez's regular duties do not require him to participate in policy debates and decision-making with the Mayor's political appointees.

233. Martinez's speech and conduct in this context are outside his official duties and constitute protected activity, including political expression and conduct.

234. Martinez's official duties do not require him to respond to political appointees' directives to engage in unlawful or unethical actions or engage in actions in violation of his duties as a practicing attorney in Colorado.

235. No employee's official duties include participating in fraud, concealing material facts from a federal government agency with enforcement authority over their employer, not keeping records as required by law, taking action in conflict with their ethical duties as an attorney, or fabricating evidence to present to a federal agency.

236. In these actions, Martinez was not offering routine legal advice to Brown, Dolan, Doheny, and the City. Instead, Martinez was attempting to save the City and Airport from severe legal actions and the loss of millions of dollars and assets, and he was refusing to break the law and/or violate the ethical rules governing practicing attorneys in Colorado.

237. Martinez engaged in protective expression and conduct on matters of public concern when he refused Defendants' pressure to join them in taking action to remove Washington as CEO.

Docusign Envelope ID: 1B632CC9-FFD2-4B98-8D83-261A2E13F54E

238. Concerning the Defendants' directives or solicitations to join them to take care of Washington, his duties did not require him to participate in a politically motivated personnel action over which he had no role as a career service, non-policymaking employee, non-political appointment, with no supervisory role over Washington, or participate in race discrimination by joining the targeting of the leading Black official at the Airport.

239. Brown made the comment to Martinez about him getting on Board and joining her and political appointee colleagues to take care of Washington, in the same meeting, and shortly after she told Martinez to hang himself with a noose.

240. Park Hill Land Swap Protected Expression. Martinez engaged in repeated, protected expressions on issues of public concern in the context of the Park Hill real estate deal, about (1) the Mayor's premature announcement of the project; (2) the critical importance of the FAA Revenue Diversion rule, the required FAA approval process, and the legal and financial risks of the City for violating the rule, (3) the Mayor's office granting the private developer 20 more acres than the number of acres approved by the City Council because (a) the FAA approval process [Form 743 process] had not been initiated or completed for the additional acreage, (b) the City Council had not approved the expansion at the time, and (c) the City Council never approved the additional acreage, (4) the Park Hill real estate land swap deal being a real estate transaction involving the City and Airport, where the Airport received less than fair market value, and the transaction was at a market value less than an arm's length transfer, violating FAA mandates; (5) Doheny and her team had ignoring the Airport's appraisal of the land as being at a higher value than the appraisal used by the Mayor's office, resulting in a transaction below fair market value, with the Airport receiving less than market value for the land in question, and (6) about to Doheny's refusal to treat the Airport as a separate legal entity as required by the FAA.

241. <u>Park Hill Real Estate Protected Conduct</u>. Martinez engaged in protected conduct by rejecting and refusing to follow unlawful and/or unethical directives from the Defendants, including directions to (1) conceal a material fact from the FAA regarding the private developer's involvement in the Park Hill land swap deal; (2) not keep records on the Park Hill land swap deal; (3) not have Martinez's team to not keep records on the deal; and (4) admit his legal opinions on multiple parts of the Park Hill land swap deal were wrong.

242. <u>Key Lime Airlines Protected Expression</u>. Martinez informed the City Council of the FAA-related risks in the Key Lime Airlines case, including the likelihood that the FAA would pursue the City for banning the lease to Key Lime Airlines for reasons other than safety, which is considered a discriminatory reason under the FAA.

229. Martinez spoke with Amanda Sandoval, President of the City Council. Martinez conveyed, as part of raising Airport compliance concerns, the potential penalties imposed by the FAA for the City taking action against Key Lime Airlines for reasons the agency considers discriminatory, which is any action other than one concerning safety; (2) the likelihood the FAA would scrutinize the Key Lime Airlines action; and (3) the possibility that the FAA now could cancel all grants, meaning the City and Airport could lose millions of dollars in federal grant money.

243. The City Council and Sandoval are outside of Martinez's chain of command.

244. Martinez's warnings were prescient because the FAA contacted Phil Washington on December 31, 2025, with its concerns about the Key Lime Airlines transaction.

245. <u>Protected Conduct re: Colorado Rules of Professional Responsibility</u>. Martinez engaged in protected conduct in refusing the Defendant's directives, which would have forced Martinez to violate specific provisions of the Colorado Code of Professional Responsibility, including but not

34

limited to the following rules: (1) Rule 2.1, Independent Professional Judgment; (2) Rule 1.6, Confidentiality/Disclosure [prohibits a lawyer from assisting a client in conduct the lawyer knows to be criminal or fraudulent]; (3) Rule 8.4(c), Misconduct: Dishonesty and Misrepresentation; and (4) Rule 8.4(b), Misconduct: Criminal Acts.

246. <u>Protected Conduct Regarding Colorado Criminal and Civil Statutes</u>. Martinez's refusal to follow the City's directive not to keep records of the Park Hill real estate deal constitutes protected conduct by refusing to participate in potential criminal conduct.

247. Under Colorado criminal law, C.R.S. § 18-8-114, the following actions are a class 2 misdemeanor, a person (1) knowingly makes a false entry in or falsely alters any public record; (2) knowing the person lacks the authority to do so, the person knowingly destroys, mutilates, conceals, removes, or impairs the availability of any public record; or (3) knowing the person lacks the authority to retain the record, the person refuses to deliver up a public record in the person's possession upon proper request of any person lawfully entitled to receive such record.

248. At all times, Brown, her predecessors, Doheny, and Dolan were aware of Martinez's protective expression and conduct.

249. In retaliation for Martinez's protected conduct and complaints, from May 2024 through January 13, 2026, the Defendants initiated and continued a pattern of escalating adverse actions designed to punish Martinez's protected expression and conduct, as well as to coerce his silence. The Defendant's actions would discourage a person of ordinary firmness from continuing to engage in the protected activity.

250. The Defendant's retaliatory actions culminated in the Defendants informing Martinez that he would be removed as General Counsel.

251. Martinez's protected activities were a "substantial factor or a motivating factor" in the

35

Defendants' adverse actions.

252. The Defendants' interests, as employers, in promoting the efficiency of the public service, are not sufficient to outweigh Martinez's interests of freedom of expression.

253. The Defendants would not have reached the same employment decisions in the absence of Martinez's protected conduct.

254. At the time of the actions of Brown and her predecessors, Doheny, and Dolan, the law was clearly established under the First Amendment: (a) a local government employee has a First Amendment right to engage in protected expression and conduct on matters of public concern, and (b) local government employers and officials are prohibited from retaliating against individual employees for engaging in protected expression and conduct.

255. Defendants violated Martinez's First Amendment rights when they informed Martinez, who engaged in protected activity, that he could not serve as General Counsel.

## SECOND CLAIM

### First Amendment Retaliation

### [Martinez's Right to Expression and Petition the Government]

256. Martinez incorporates and realleges all prior allegations in the Complaint.

257. Martinez brings this claim under the First and Fourteenth Amendments and 42 U.S.C. § 1983.

258. The First Amendment protects a local government employee's right to petition his employer for redress and submit grievances and complaints on matters of public concern, including through formal grievance procedures established by the employer.

259. On January 13, 2026, Martinez petitioned the City's Office of Human Resources by filing a complaint with OHR.

260. The OHR complaint constitutes petitioning activity protected by the First Amendment's Petition Clause when it raises matters of public concern.

261. A formal complaint filed through an employer's internal process constitutes petitioning activity.

262. Martinez's complaint to OHR addressed matters of public concern.

263. Martinez communicated to OHR that the Defendants wanted him to conceal material facts from a federal agency, fabricate an investigation, not keep records, and refused to follow FAA-mandated practices.

264. This petition and expression addressed (1) the integrity of a major international airport's dealings with the FAA, the fabrication of government records, and discrimination in the leadership of DEN, and (2) the City's unlawful and/or unethical directives to Martinez, which he refused to follow.

265. By the time of Defendant's retaliation against Martinez, his First Amendment right to petition local government officials without being subjected to retaliation was clearly established.

266. By the time of Defendant's retaliation against Martinez, his First Amendment right to petition his government employer through one of the employer's formal complaint processes and on issues of public concern, without being subjected to retaliation, was clearly established.

269. In response to Martinez's January 13, 2026, OHR complaint, the Defendants escalated their retaliatory conduct against him, culminating in informing him on March 11, 2026, that he would no longer serve as General Counsel. After Martinez's OHR complaint, Defendants gave him the lowest performance evaluation of his career. This was the first evaluation in which he received a "development needed" rating on a performance evaluation element.

270. For example, Brown accused Martinez of poor management of Steinberger on matters related to the Park Hill land swap and Key Lime Airlines.

271. Brown held meetings with Steinberger, without Martinez present, directing Steinberger to again tell the Airport leadership to investigate the safety record of Key Lime Airlines as a post hoc reason to give to the FAA for the City Council's "no" vote.

272. Even though Brown excluded Martinez from these meetings, she still blamed him for failing to supervise Steinberger on the Key Lime matter.

273. The Defendant's adverse actions were substantially motivated by Martinez's filing of the grievance with OHR.

274. The Defendants' interests, as employers, in promoting the efficiency of the public service, are not sufficient to outweigh Martinez's interest in having the right to petition the government for redress.

275. The Defendants would not have reached the same employment decisions in the absence of Martinez's protected conduct.

276. At the time of the actions of Brown and her predecessors, Doheny, and Dolan, the law was clearly established under the First Amendment: (a) a local government employee has a First Amendment right to petition the government, including his employer, for redress on matters of public concern, and (b) local government employers and officials are prohibited from retaliating against individual employees for engaging in protected conduct, including the protected activity of petitioning the government for redress.

### THIRD CLAIM

**First Amendment Retaliation**

**[Martinez's Association, Expression & Petition through Counsel]**

**[February 20, 2026 – March 11, 2026]**

277. Martinez incorporates and reasserts the prior paragraphs of this Complaint.

278. The First Amendment right of association protects local government employees' right to retain an attorney to express the employee's interests on matters of public concern and to petition the

government for redress of grievances on the client's behalf.

279. Martinez engaged in constitutionally protected conduct when he retained a private attorney, and his attorney made three submissions to the Defendants regarding public concerns.

280. The three submissions addressed matters of public concern.

281. On February 20, 2026, Martinez's attorney submitted the previously described letter to each Defendant and the City.

282. On March 9, 2026, as described, Martinez's attorney again submitted a letter outlining Martinez's claims, along with a position statement, supporting legal authority, and exhibits.

283. Following Martinez's exercise of his First Amendment rights to freedom of expression and association and his right to petition the government through his attorney, the Defendants retaliated against him on March 11, 2026, less than two days after his last submission on March 9, 2026.

284. This retaliatory conduct that occurred on March 11, 2026, was the Defendants telling Martinez he would be removed from his General Counsel position.

285. Martinez's protected First Amendment actions were substantial and/or motivating factors for the adverse employment actions taken by the Defendants, which occurred almost immediately after Martinez engaged in the protected activity of associating with an attorney and the attorney exercised Martinez's right to petition the government on matters of public concern, on behalf of Martinez.

286. The Defendants' interests, as employers, in promoting the efficiency of the public service, are not sufficient to outweigh Martinez's interest in having the right to petition the government for redress.

287. The Defendants would not have reached the same employment decisions in the absence of Martinez's protected conduct.

288. At the time of the Defendant's actions, it was clearly established that a public employee

has a First Amendment right to associate with an attorney and have the attorney petition the government on the employee's behalf for redress, and the employer and the employer's political officials are prohibited from retaliating against him for his exercise of these rights.

## FOURTH CLAIM

### First Amendment Retaliation

### [Martinez's Association, Expression & Petition through Counsel]

### [March 18, 2026 – March 20, 2026]

289. Plaintiff Martinez incorporates and reasserts the prior paragraphs of this Complaint.

290. The First Amendment right of association protects local government employees' right to retain an attorney to express the employee's interests on matters of public concern and to petition the government for redress of grievances on the client's behalf.

291. Martinez engaged in constitutionally protected conduct when he retained a private attorney, and his attorney filed the complaint in this civil action on March 18, 2026. [ECF Doc 1].

292. The First Amendment protects the right to associate with an attorney and have the attorney petition the court on behalf of the employees, on matters of public concern by filing a lawsuit in court on behalf of the employee.

293. Following Martinez's exercise of his First Amendment rights to freedom of expression and association and his right to petition the government by filing a lawsuit, the Defendants retaliated against him by: (1) issuing a statement to Denver local media that he violated the attorney client privilege with statements in the lawsuit and/or violated his attorney client privilege with the statements in the lawsuit, and (2) changing his employment status from administrative leave to investigatory leave with restrictive and punitive terms and conditions.

294. Martinez's protected First Amendment actions were substantial and/or motivating

40

factors for the adverse employment actions taken by the Defendants, as this occurred almost immediately after Martinez engaged in the above-protected activity.

295. The Defendants' adverse employment actions against Martinez would deter a reasonable person from exercising his protected rights of expression and association for matters of public concern.

296. The Defendants' interests, as employers, in promoting the efficiency of the public service, are not sufficient to outweigh Martinez's interest in having the right to petition the government for redress.

297. The Defendants would not have reached the decisions or taken the same actions in the absence of Martinez's protected conduct.

298. At the time of the Defendant's actions, it was clearly established that a public employee has a First Amendment right to associate with an attorney and have the attorney petition the government on the employee's behalf for redress by filing a lawsuit, and the employer and the employer's political officials are prohibited from retaliating against him for his exercise of these rights.

### FIFTH CLAIM

### First Amendment Retaliation [Political Expression]

299. Plaintiff Martinez incorporates and realleges all prior allegations in this Complaint. Martinez engaged in protected political activity by refusing to accept the Defendant's invitations, encouragement, or pressure to work with them to "take care of" Washington, the Airport CEO. Brown, Doheny, and Dolan are political appointees of Mayor Johnston.

300. Washington is a political appointee of the former Mayor.

301. Martinez's employment is classified as "civil service," which covers and protects employees listed under this classification by the City's Career Service program and its rules.

41

302. Unlike Dolan, Doheny, and Brown, Martinez is neither a political nor a mayoral appointee, nor does he serve in a policymaking position.

303. The First Amendment prohibits the government from conditioning public employment on political compliance or loyalty, including requiring employees to carry out politically motivated personnel actions.

304. The First Amendment protects the right to speak, participate, and engage, but also the right to refuse to do so.

305. Martinez engaged in protected activity by refusing to join or carry out the Defendants'. politically motivated directive directed at Washington.

306. The Defendants were aware of Martinez's protected conduct.

307. The Defendants sought to coerce Martinez into participating in a politically motivated personnel action, and when he refused, the Defendants retaliated.

308. The Defendants took adverse retaliatory actions, including a continuous pattern of escalating retaliation, culminating in the Defendants informing Martinez would be replaced as General Counsel.

309. Martinez's protected conduct, his refusal to participate in the politically motivated effort to "take care of Washington," was a substantial or motivating factor in the Defendant's adverse actions.

310. Additionally, Martinez has no supervisory authority over Washington.

311. At the time of the Defendants' actions, it was clearly established that the First Amendment prohibits a government employer from retaliating against a public employee for refusing to participate in a politically motivated personnel action.

## SIXTH CLAIM

### [Race Discrimination and Retaliation]

### [Fourteenth Amendment: Race Discrimination: Equal Protection of the Law]

312. Plaintiff Martinez incorporates and realleges all prior allegations in this Complaint.

313. The Equal Protection Clause of the Fourteenth Amendment prohibits race discrimination by local government employers.

314. Martinez is a member of a protected class based on race.

315. The Defendants subjected Martinez to a series of adverse employment actions.

316. The totality of the circumstances gives rise to an inference of unlawful race discrimination.

317. The Defendants targeted two people of color: Martinez and Washington, two senior officials at Denver International Airport, and they are both under attack by the same group of political appointees.

318. The Defendants pressured, encouraged, or invited Martinez to work with them to "take care of" Washington.

319. No similarly situated white officials have been targeted.

320. The Defendants' adverse actions fall exclusively on two people of color in the Airport's senior leadership.

321. Defendants also departed from ordinary norms regarding Washington and Martinez.

322. Rather than work with Washington to resolve any issues with him, as Martinez repeatedly suggested, the Defendants pressured Martinez to join them in their effort to take care of Washington.

323. When Martinez repeatedly refused, the Defendants' retaliatory treatment escalated in severity.

324. On or about January 7-8, 2026, Brown, the City Attorney, told Martinez to "get a noose and hang yourself with it" if Martinez was not to get on board with the plan to remove Washington.

325. It is unquestioned that the reference to a noose is a race-based term linked to a history of racial violence in America.

326. This comment was not a stray comment, but a statement made by the white City Attorney, appointed by the Mayor, to Martinez, a Hispanic man, who had been the target of Brown and her political colleagues' retaliatory behavior.

327. Brown's "noose" comment was made in the same discussion with Martinez, in which she said he should get on board and help her and her political colleagues take care of Washington.

328. Brown's comment was made to Martinez in an attacking and threatening manner in the context of her other statements in the same discussion about maybe "this is not the place for you," suggesting it was time to leave his job and City employment.

329. The totality of the relevant facts gives rise to an inference of discriminatory purpose.

330. Racially charged comments by decision makers, combined with adverse employment actions, support an inference of discriminatory intent.

331. After subjecting Martinez to a pattern of retaliatory and discriminatory activity, the Defendants denied him the pay raise and job reclassification, which had been recommended by Washington and two Airport Chief Financial Officers, ignored his record of accomplishment, and, without any discussion toward any resolution, summarily told him they were going to remove him as General Counsel and end his employment.

332. The Defendant's adverse actions were motivated in part by Martinez's race.

44

333. At the time of the Defendants' actions, it was clearly established that the Equal Protection Clause of the Fourteenth Amendment prohibits City employers from taking adverse action against employees on the basis of race.

## SEVENTH CLAIM

### [Retaliation – False Claims Act]

334. Plaintiff Martinez incorporates and realleges all prior allegations in this Complaint.

335. Martinez asserts this claim against his employer, the City, under 31 U.S.C. § 3730(h). Martinez engaged in protected conduct under the False Claims Act ("FCA").

336. FCA protected activity includes acts taken "in furtherance of" an FCA action or "other efforts to stop" one or more violations of the FCA. Under the FCA, protected activity encompasses internal complaints, refusals to participate in fraud, and investigations or reports on false or fraudulent claims.

337. Martinez refused the City's directives to: (1) conceal a material fact from the FAA regarding the involvement of the private developer in the Park Hill land swap deal; (2) participating in fabricating an investigation for a false reason and then presenting a fabricated reason based on a falsehood to the FAA as the untrue, after the fact, post hoc justification for the City denying at least one Lease (Key Lime Airlines).

338. Martinez's actions were in an effort to stop the City from submitting any false or fraudulent claim, in whole or in part, or making any false or fraudulent statement to the federal government.

339. The City was aware of Martinez's protected activities.

340. The City took a series of adverse actions against Martinez as covered by the FCA.

341. The City initiated a pattern of escalating adverse actions against him, culminating in telling Martinez that the City was removing him from his position as General Counsel and ending his

45

employment.

342. The FCA covers a broad range of adverse actions, including threats, harassment, discharge, demotion, suspension, and any other manner of discrimination in the terms and conditions of employment.

343. Martinez's protected prior FCA activity was a contributing factor in the Defendants' adverse actions.

344. Because of the Defendant City's violation of the FCA, Martinez has suffered harm.

345. Martinez seeks all economic and non-economic damages available under the FCA.

## VI. REQUEST FOR RELIEF

WHEREFORE, Plaintiff Everett Martinez respectfully requests that this Court:

(1) Enter judgment for Plaintiff and against all Defendants, finding intentional retaliation for protected First Amendment activity, including speech on public concern, right of association, right to petition, and the right to refuse compelled political loyalty.

(2) Enter judgment for Plaintiff and against all Defendants, finding intentional race discrimination under the Fourteenth Amendment, 42 U.S.C. §1983.

(3) Enter judgment for Plaintiff and against the City, finding retaliation under the False Claims Act, 31 U.S.C. § 3730(h).

(4) Award any back pay and all financial damages under Title VII.

(5) Award compensatory damages for emotional distress, mental anguish, humiliation, and loss of enjoyment of life.

(6) Award reinstatement as General Counsel, or, in the alternative, front pay.

(7) Award economic and compensatory damages on all constitutional claims under Section 1983.

(8)     Award punitive damages against Brown, Doheny, and Dolan.

(9)     Award economic and compensatory damages on all constitutional claims under Section 1983.

(10)    Award attorneys' fees and costs under 42 U.S.C. § 1988.

(11)    Award pre-judgment and post-judgment interest.

(12)    Direct Defendants to take affirmative steps to eliminate the effects of their unlawful practices.

(13)    Award all other relief this Court deems just and proper.

## VII.   JURY TRIAL REQUEST

Under Fed. R. Civ. P. 38, 42 U.S.C. § 2000e-5, 42 U.S.C. § 1981a(c)(1), and all applicable laws, Plaintiff requests a jury trial on all claims and issues.'

## VERIFICATION

I, Everett Ben Martinez, declare under penalty of perjury under the laws of the United States of America, including 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Signed by:

*Everett Martinez*                                3/23/2026

F3DDAD07B4D6417...

_____

Everett Ben Martinez                              Date

Docusign Envelope ID: 1B632CC9-FFD2-4B98-8D83-261A2E13F54E

Dated: March 23, 2026

Respectfully submitted,

*/s/ Steven L. Murray*
Steven L. Murray
Murray Law, LLC
3900 East Mexico Avenue, Suite 300
Denver, CO 80210
Telephone: 303-396-9952
Email: steven@smurraylaw.com

Andrea F. Sobel
Brandon S. Armitage
Sobel Law, LLC
2000 S. Colorado Blvd. Bldg. 1
Suite 2000
Denver, CO 80222
Email Addresses:
andrea@sobel.law
brandon@sobel.law

Attorneys for Plaintiff