# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:26-cv-01100-SKC-KAS

EVERETT BEN MARTINEZ,

    Plaintiff

    v.

CITY AND COUNTY OF DENVER,

MICHIKO "MIKO" BROWN, DENVER CITY ATTORNEY,
    In her official and individual capacities,

NICOLE DOHENY, CHIEF FINANCIAL OFFICER FOR THE CITY,
    In her official and individual capacities, and

JEFF DOLAN, CHIEF STRATEGIST FOR THE MAYOR OF DENVER
    In his official and individual capacities.

    Defendants.

---

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

---

## INTRODUCTION

Plaintiff Everett Ben Martinez [Plaintiff or Martinez], through his attorneys, Steven L. Murray of Murray Law, LLC, and Andrea F. Sobel and Brandon S. Armitage of Sobel Law, LLC, submits his motion for a temporary restraining order under Fed. R. Civ. P. 65(b)(1). Martinez seeks injunctive relief against all Defendants in their individual and official capacities and requests a hearing forthwith.

Martinez is the General Counsel and an Executive Vice President for Denver International Airport [DIA or Airport]. [Ex. 1, p. 1, ¶ 1]. The Defendants' retaliation against Martinez is vivid. On the morning of March 9, 2026, he was General Counsel. Later in the day, he engaged in protected

First Amendment activity through his attorney by submitting two documents [petitions] to Defendants outlining his constitutional claims of retaliation and discrimination against the City and the individual defendants. [Ex. 4; 5]. Two days later, on March 11, 2026, the Defendants informed Martinez that he would no longer serve as General Counsel and offered him three options: resign, be removed, or be disqualified [Ex. 1, p. 2, ¶¶ 2-7].

Immediate injunctive relief is necessary to stop the Defendants' escalating pattern of retaliation against Martinez, which continues to cause him emotional harm, anxiety, and fear about his professional future. Injunctive relief is warranted because he meets all four requirements for obtaining a temporary restraining order under Fed. R. Civ. P. 65(b)(1).

### A. Legal Overview re: Injunctive Relief

In *Jessica Calderon v. City of Denver*, No. 24-CV-02406-NYW-TPO, 2025 WL 2676046, at *1 (D. Colo. Sept. 17, 2025), a First Amendment retaliation case, the Court issued a TRO blocking the City of Denver's termination of a longtime city employee who claimed Mayor Johnston's office in issue had retaliated against her for her political associations, in violation of the First Amendment. Previously, in *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243 (10th Cir. 2024), also a First Amendment retaliation case, the Tenth Circuit affirmed a preliminary injunction preventing Denver Public Schools from enforcing retaliatory restrictions against a community advocate who spoke on matters of public concern.

### B. Most Recent Events

Martinez filed an internal complaint with the City's Office of Human Resources [OHR] on January 13, 2026. [Ex. 1, p. 29, ¶ 204; Ex. 2]. On February 20, 2026, Martinez, through his attorney Steven Murray, engaged in protected First and Fourteenth Amendment activity by submitting a letter to the City and Miko Brown, Nicole Doheny, and Jeff Dolan, the individual defendants. [Ex. 3]. The February 20 document outlines Martinez's claims for retaliation and discrimination under the First

and Fourteenth Amendments, 42 U.S.C. §§ 1981, 1983 [Sections 1981 and 1983], Title VII of the Civil Rights Act of 1964 [Title VII], 42 U.S.C. § 2000e-2000e-17, and the Colorado Anti-Discrimination Act [CADA], C.R.S. §§ 24-34-401 to 406. [Ex. 3, p. 2]. Moreover, the February 20 document states that Martinez has claims against Brown, Dolan, and Doheny in their individual capacities under Section 1983 and CADA. [Ex. 3, p. 2]. In addition, the letter addresses retaliation, stating (1) the document is protected activity under Title VII, CADA, Section 1981, and the First Amendment; (2) these provisions prohibit the City and City officials, supervisors, managers, and employees from retaliating against Martinez for submitting his claims in this document; and (3) the document may be used in future proceedings against the City and City officials. [Ex. 3, pp. 2-3].

On March 9, 2026, Martinez's attorney submitted two documents to the attorney retained by the City: (1) a letter, and (2) a comprehensive position statement discussing Martinez's claims, supported by detailed facts and extensive legal analysis. [Ex. 4, 5].

The March 9 letter states that Martinez has viable retaliation and discrimination claims he may assert in the United States District Court at any time, without any government immunity notice or exhaustion of remedies. These claims were (1) First Amendment Retaliation, (2) Race/Ethnic Discrimination: Fourteenth Amendment, (3) Retaliation re: Race/Ethnic Discrimination: Fourteenth Amendment, and (4) retaliation under the False Claims Act, 31 U.S.C. §§ 3729–3733. [Ex. 4, pp. 3-4].

The March 9 position statement outlines Martinez's compelling claims under Title VII, CADA, 42 U.S.C. §§ 1981 and 1983 [Sections 1981 and 1983], the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and a retaliation claim under the False Claims Act, 31 U.S.C. §§ 3729–3733. [Ex. 5, pp. 5-6]. The statement explains that, under Sections 1981 and 1983, the False Claims Act, and CADA, Brown, Dolan, and Doheny may be held personally liable for back pay, front pay, compensatory damages, punitive damages, attorneys' fees, and costs, and

may be subject to individual liability under CADA. C.R.S. § 24-34-402 (1)(e)(I) -(IV) (2025). [Ex. 5, p. 6]. Further, the statement addresses retaliation, stating (1) this position statement is protected activity under Title VII, CADA, Sections 1983 and 1981, and the FCA,  (2) these legal provisions prohibit the City, Brown, Doheny, Dolan, and other City officials, supervisors, managers, and employees from retaliating against Martinez for submitting his claims; and (3) the statement "may be used in future proceedings against the City and the individuals for unlawful retaliation." [Ex. 5, pp. 6-7].

Fed. R. Evid. 408 does not prohibit Martinez's use of the three submissions from his attorney in support of this motion. The February 20 letter and March 30 position statement include a specific carve-out provision stating that the cited legal provisions prohibit retaliation against Martinez, the documents are protected activities under those provisions, and the submitted documents may be used in legal proceedings against the City and City officials. Attorney communications used for "another purpose" under Fed. R. Evid. 408(b), e.g., to show protected activity for retaliation claims, are not barred. *Robinson v. De Niro*, 739 F. Supp. 3d 33, 85, n.17 (S.D.N.Y. 2023). *Williams v. Regus Mgmt. Grp., LLC,* No. 10 CIV. 8987, 2012 WL 1890384, at *4 (S.D.N.Y. May 15, 2012) [evidence offered and admitted to show party engaged in a protected activity known to the defendant, which is an element of his retaliation claim].

Martinez filed his Complaint on March 18, 2026, asserting five claims: three claims for retaliation under the First and Fourteenth Amendments and Section; a race discrimination claim under the Equal Protection Clause of the Fourteenth Amendment and Section 1983; and a retaliation claim under the False Claims Act. [ECF 1]. As developed herein, on March 18-19, the Defendants resumed their retaliation campaign against Martinez.  The Defendants submitted a statement to several local media voices and publications alleging that he violated the attorney-client privilege in

statements in his Complaint. [Ex. 1, p. 34, ¶ 227]. The Defendants also changed Martinez's leave status from "administrative" to "investigative". [Ex. 1, p. 34, ¶ 228; Ex. 6].

On March 24, 2026, Martinez filed his Verified Amended Complaint. [ECF 10]. Later that day, the Defendants modified the imposed investigative leave by removing the provision requiring him to stay at home and report to the Defendants. [Ex. 1, p. 34, ¶ 232; Ex. 7].

**C. Requested Remedy**

Martinez requests that the Court issue a temporary restraining order preventing the Defendants from: (1) removing or proposing to remove him from his position as General Counsel, (2) disqualifying or disciplining him, or proposing to take these actions, and (3) continuing to place him on investigative leave. Also, Martinez requests the Court's order to require the Defendants to (4) return him to administrative leave pending the resolution of this civil action, (5) issue a sixty-day restraining order to facilitate resolution or until the Court rules on a his preliminary injunction motion to be filed no latter April 7, 2026, or earlier as the Court orders, (6) to participate in private mediation and pay all mediation costs, and (7) issue a retraction to all media and internal recipients regarding the alleged violation of attorney-client privilege. Notice: In conjunction with filing this motion, Martinez's counsel will submit, via email, this motion and all exhibits to the individual defendants and three attorneys in the City Attorney's Office who have had a role in this case. [See certificate of service].

**OVERVIEW OF FACTS**

**A. People & Events**

1. Martinez has sterling legal credentials. He graduated from Harvard Law School. During his career with the City, he consistently earned positive or outstanding performance evaluations and earned additional recognition for his service and performance. [Ex. 1, p. 3, ¶¶ 16-19]. He is one of six Executive Vice Presidents with the Airport and the only one who is not a political appointee. .

[Ex. 1, p. 3, ¶ 14].  Martinez's employment is protected under the Denver Career Service framework. He is not a political appointee. [Ex. 1, p. 3, ¶ 13]. Accordingly, Martinez is not a policymaker who could be terminated for purely political reasons.

2. Denver Mayor Mike Johnston appointed Brown, Doheny, and Dolan to their positions. [Ex. 1, p. 4, ¶ 24]. Phil Washington, a Black man, is the Chief Executive Officer [CEO] of the Airport, a political appointee of former Mayor Mike Hancock. [Ex. 1, p. 8, ¶ 51].

3. The Mayor's Park Hill Golf Course deal involved the City transferring land from the Airport to a private developer, who then transferred land at the golf course back to the City. E.g., Ex. 1, p. 9, ¶ 56. In December 2025, the Denver City Council voted not to approve Key Lime Airlines' lease for a specific building at the Airport because the airline was transporting individuals subject to deportation based on their immigration status, according to the Council's public statements. [Ex. 1, pp. 24-25, ¶ 170].

**B.** **FAA Enforcement & General Counsel Role**

4. The Federal Aviation Administration (FAA) views the Airport and the City as separate legal entities. [Ex. 1, p. ¶ 26]. The Airport receives hundreds of millions of dollars in federal FAA funding. When the FAA provides funds to the Airport, the City, designated as the airport sponsor under FAA legislation, must agree to a set of legally binding promises known as Airport Sponsor Grant Assurances. These assurances require the City to comply with federal aviation law and to protect airport property and revenue, ensuring they are used exclusively for airport purposes. [Ex. 1, p. 4, ¶¶ 25-26].

5. The FAA revenue diversion rule prohibits the use of airport property or airport revenue for non-airport purposes unless strict conditions are met. [Ex. 1, p. 5, ¶ 29]. Martinez's declaration also explains the role of the General Counsel, the mandated parts of the revenue diversion rule, the FAA's enforcement authority, the application of the revenue diversion role and the FAA

requirements to the Park Hill rea estate deal and the Key Lime matter, and the significance the General Counsel's salary being paid from the Enterprise Fund, not the General Fund. [Ex. 1, pp. 4-8, ¶¶ 25-50].

### C. Three Parts of the Case

6. Part One: May 24, 2024 – January 13, 2026. The Mayor's office, through Defendants Doheny, Dolan, and Brown, retaliated against Martinez for his legal analysis, objections, and warnings about the Mayor's real estate deal. His objections included: (1) the Mayor's premature announcement of the deal when the Purchase and Sale Agreement had not been signed, the FAA process was not finished, and the City Council had not voted on the deal [Ex. 1, pp. 16-17, ¶¶ 100-107]; (2) on a separate issue, the City starting the FAA approval process without complete, required information [Ex. 1, pp. 13-14, ¶¶ 83-89]; (3) Dolan and Doheny agreeing to give the developer an extra 20 acres without City Council approval [Ex. 1, pp. 19-20, ¶¶ 124-129]; and (4) the City not conducting an arm's length transaction by ignoring the land's appraisal, preventing the Airport from getting fair market value [Ex. 1, p. 13, ¶ 84; p. 15, ¶ 96; pp. 17-18, ¶¶ 108-118].

7. Martinez refused to follow Defendants' directives to engage in unlawful or unethical conduct. First, Martinez refused Defendant Doheny's directives, on more than one occasion, to conceal material facts from the FAA regarding the real estate deal. [Ex. 1, p. 15, ¶¶ 92-95]. Martinez refused this directive each time. He did not conceal this fact or any fact from the FAA. [Ex. 1, p. 15, ¶¶ 96-99]. Second, Martinez refused Acting City Attorney Katie McLaughlin's directive not to keep records of the real estate deal and to instruct his Airport team not to keep records. [Ex. 1, pp. 18-19, ¶¶ 119-123]. He immediately contacted Washington and his two Assistant General Counsel and told them to disregard McLaughlin's directive or any similar directive from anyone, including himself. Later, he told the rest of his team to continue maintaining records. [Ex. 1, p. 19, ¶ 122].

8. Third, Martinez refused Brown's illegal directive to start a fabricated Key Lime investigation after the City Council voted to deny the airline a lease at a specific airport storage space. He refused to initiate an improper investigation to provide a false reason to justify the City Council's decision regarding the Key Lime lease, or to take any action to create a false excuse for Brown to have "in her back pocket" to present to the FAA as justification for the City's decision. [Ex. 1, pp. 25-26; ¶¶ 174-180].

9. Fourth, Martinez refused to follow Brown's directive, given at least four times, to correct his legal opinions about the deal and the City's dealings with the FAA [Ex. 1, p. 28, ¶¶ 192-193]. Brown threatened to discipline him if he refused. He refused. [Ex. 1, p. 29, ¶¶ 201-203].

10. Finally, Martinez refused Brown's directive invitation: "If you can get on board with Dolan, Doheny, and me, then we can take care of [Washington] together." Brown then told him: "Or get a noose and hang yourself with it. [Ex. 1, p. 29, ¶¶ 201-203]. The reference to a noose is a racist rope, particularly to a person of color.

11. The Defendants retaliated against Martinez by denying him a pay raise and an upward job reclassification for his Executive Vice President position. In June 2024, Washington, the Airport CEO, and Mike Nakornkhet, the former Chief Financial Officer for the Airport, recommended the pay raise and reclassification. In 2025, Michael Biel, the Airport's current CFO, confirmed the recommendation. [Ex. 9]. Martinez is the only EVP at the Airport who is not classified as EX-22. The change would have increased Martinez's annual pay by about $50,000.00. [Ex. 1, pp. 21-22, ¶¶ 140-150].

12. Between August 12, 2025, and September 2, 2025, Martinez made three requests to Dolen to act on the recommended pay raise and reclassification and provided him with the recommendation. [Ex. 10]. The Defendants never granted him the recommended pay raise and reclassification. [Ex. 1, p. 22, ¶ 150].

13. The Defendants retaliated against Martinez by (1) disparaging him professionally and personally to an outside airport law expert and named partner at a firm the Airport regularly retains. [Ex. 1, p. 22, ¶¶ 151-156]; and (2) accusing him of sabotaging the Park Hill real estate deal ].[Ex. 1, p. 22, ¶¶ 157-159].

14. The Defendants continued their retaliatory campaign on or around January 7-8, 2026, during meetings with Brown and Martinez. Brown (1) told Martinez had no credibility and was "full of shit" [Ex. 1, pp. 28-29, ¶ 201];(2) improperly disclosed a private attorney-client-privileged communication from Brown to Washington to Dolan; and (3) repeatedly told him, "this may not be the place for you." Ex. 1, pp. 28-29, ¶¶ 191-203].

15. Also, in the meeting on January 7-8, 2026, Brown directed him to "come clean" to Dolan and Doheny, in writing, about "all the wrong you have done," which was a demand that he falsely confess in writing that his advice on the real estate deal to Washington was wrong or improper. Outside FAA counsel to the Airport had confirmed that Martinez's advice was correct [Ex. 1, pp. 28-29, ¶¶ 191-194].

16. Part Two. January 13, 2026 – March 18, 2026. After Martinez filed his OHR complaint on January 13, 2026, the Defendants retaliated by giving him the lowest performance evaluation of his career, marking the first time he received a "development needed" rating on a specific element. [Ex. 1, p. 31, ¶¶ 210-212; Ex. 11].  The Tenth Circuit has held that poor evaluations and removal of duties can support a First Amendment retaliation claim. *Littlefield v. Weld Cnty. Sch. Dist.*, 2023 WL 6962087, No. 22-cv-02241, at *8 (D. Colo. Oct. 19, 2023) (citing published 10th Circuit decisions).

17. Part Three. March 18-23, 2026. Immediately after Martinez filed suit, the Defendants resumed their retaliation. The Defendants issued a statement which appeared in at least seven online publications, excluding other forms of media, stating: "Martinez violated his ethical obligations to

the city by taking personal positions that were in opposition to those held by his own client --- which is the City and the County of Denver --- and by disclosing information protected by the attorney-client privilege." [Ex. 8, pp. 5, 10, 17, 20, 25-26, 41-42]. The City also emailed its internal staff that Martinez's lawsuit "contains attorney-client privileged information." [Ex. 8, pp. 5, 10, 17, 20, 25-26, 41-42].

18. Before Martinez met with Smith and Coburn on March 11, 2026, no City Attorney, Deputy City Attorney, or an Assistant City Attorney, a member of the Airport leadership, or a political appointee of the Mayor had ever advised him: (1) his attorney-client relationship was with the City, and was not between him and the Airport, (2) the attorney-client privilege in his role as an airport attorney was not between the Airport and him but between the City and him. In his role as General Counsel to the Airport, his legal work is directed to the Airport and its leadership regarding airport operations and compliance with federal airport law, rather than to the City's political leadership. The legal advice he provided to the Airport regarding airport operations and FAA compliance was regarded as privileged communications belonging to the Airport and its leadership. Pp. 7-8, ¶¶ 44-48. In his declaration, Martinex expands on his role as General Counsel, his attorney-client relationship with the report and the issues of privilege in declarations. [Ex. 1, p. 7-8, ¶¶ 43-50.

19. In the Fourth Claim in his Verified Amended Complaint, Martinez asserts a First Amendment retaliation claim against the Defendants based on their statements to the media in retaliation for exercising his First Amendment right to petition the government by filing this lawsuit. [ECF 10, pp. 40-14, ¶¶ 289-298].

20. The Defendants' statements accusing Martinez of violating the attorney-client privilege are highly stigmatizing because they attack the core of his professional competence and ethics. Martinez has a viable claim against the Defendants for making damaging statements in the media in retaliation for filing a lawsuit and a petition to the government. An example is in *Neuberger v.*

10

*Gordon*, 567 F. Supp. 2d 622, 627 (D. Del. 2008), where a civil rights lawyer asserted a valid First Amendment retaliation claim against county officials under Section 1983. The claim addressed the County officials, in "an official release from the [County] in various local newspapers. Plaintiff alleges the release falsely accused him of violating federal court orders, unethical behavior, and other wrongdoing. Plaintiff claims that the release was part of a calculated effort to retaliate against, intimidate and injure him for filing numerous lawsuits challenging government corruption and for speaking to the media and the public about the same." 567 F. Supp. 2d 622, 627.

## **ARGUMENT**

Martinez meets all four requirements for a temporary restraining order under Fed. R. Civ. P. 65. *See, Calderon,* 2025 WL 2676046, at *3. Martinez seeks relief on his Third and Fourth Claims, which allege that the Defendants retaliated against him for exercising his First Amendment rights of expression, association, and petition between February 20 and March 11, 2026, and after he filed this action on March 18, 2026. These claims incorporate prior allegations, protected activities, and retaliatory events from May 2024 forward.

## 1.  FIRST TRO REQUIREMENT: LIKELY TO SUCCEED ON MERITS

Martinez meets the first temporary injunction requirement because he is likely to succeed on the merits. He meets all elements of his First Amendment retaliation claim under the *Pickering/Garcetti* test, the recognized framework for evaluating such claims against a government employer. *Brown v. City of Tulsa*, 124 F.4th 1251, 1267 (10th Cir. 2025).

### (1) **First Pickering/Garcetti Element: Speech Not Pursuant to Official Duties.**

Martinez satisfies the first element of the Pickering/Garcetti test because his actions are not related to performing official duties. His protected conduct includes: (1) associating with and hiring an attorney to petition the government, and (2) having that attorney prepare and submit three documents to the Defendants asserting his claims against the City and individual defendants. The

First Amendment protects the right to associate with and retain an attorney to seek legal redress. *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990). The right to retain counsel includes the right for the attorney to advocate on the client's behalf. *Eng. v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009). *Eng* states that the right would "ring hollow if the state could simply retaliate for the lawyer's advocacy on behalf of the client . . ." 552 F.3d 1062, 1069.

**(2) Second Pickering/Garcetti Element: Addressing a Matter of Public Concern.**

The First Amendment right to petition the government, including a public employer, requires the petition to address a matter of public concern. *Sweeney-Miran v. City of Boulder, Colorado*, No. 1:24-CV-00051-RMR-SBP, 2025 WL 684031, at \*5 (D. Colo. Feb. 17, 2025), *citing Borough of Duryea v. Guarnieri*, 564 U.S. 379, 382 (2011).

*(a) Martinez's Petitions Addressed a Matter of Public Concern: Refusals to Engage in Unlawful or Unethical Conduct.*

Martinez petitioned the government, through his counsel, on a clear matter of public Federal courts protect employees who refuse orders requiring them to commit criminal acts. Martinez's three submissions [petitions] to the Defendants, from his attorney, specifically addressing his refusal to follow the Defendants' unlawful or unethical directives.

Federal courts protect public employees who refuse orders requiring them to commit criminal acts. Martinez's position that his refusals to follow the Defendants' directives and engage in unlawful conduct, as set forth in his petitions, address matters of public concern, has wide support. One example is *Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011), in which a probationary police officer alleged he had been fired for refusing to retract a report supporting a civilian complaint. *Id*. at 230-32. The Second Circuit held that since filing a false report would imply criminal misconduct, his refusal could not have been a job requirement. This refusal was rooted in the obligation of every citizen to obey the law. It was "clear" that his refusals to change his statement involved a matter of

12

public concern. *Id.* at 240. See also, e.g., *Specht v. City of New York*, 15 F.4th 594, 602 (2d Cir. 2021).

Martinez's refusals to follow Defendants' directives were based on his professional judgment that compliance could breach his obligations under the Colorado Rules of Professional Conduct and relevant federal law. [Ex. 1, p. 28, ¶ 149]. Compliance would have exposed Martinez to criminal liability under federal and Colorado law, FAA regulations, and the Colorado Rules of Professional Conduct, including 18 U.S.C. §§ 1001, 1519, and 1512(c); C.R.S. § 18-8-114; 14 C.F.R. § 3.403; and RPC 1.2(d), 2.1, 3.4, and 8.4(c).

### *(b) (c) (d). Discrimination, Key Lime Airlines, FAA Requirements*

Martinez's expression, associations, and petitions addressed three more matters of public concern: (1) his race discrimination claim, (2) his objections to issues regarding Key Lime, and (3) his objections to the defendants' refusal or proposing to refuse also refers to refusal to follow mandated FAA procedures and requirements. Martinex will request leave from the Court to file a supplemental brief addressing these issues.

### (3) <u>Third Pickering/Garcetti Element: Efficiency.</u>

This element favors Martinez. No efficiency interest justifies removing a General Counsel because he hired a lawyer and asserted claims. The government bears the burden of demonstrating its interest and proving disruption. A plaintiff cannot reasonably be expected to allege facts that support the government's burden on the third element of a First Amendment retaliation claim. *Sweeney-Miran v. City of Boulder, Colorado*, No. 1:24-CV-00051-RMR-SBP, 2025 WL 684031, at *8 (D. Colo. Feb. 17, 2025)[internal citations and quotations omitted']

*Pryor* found the government does not meet its burden by alleging that punishing First Amendment rights is justified because its interest in curbing an expected public reaction, or in avoiding embarrassment or irritation at the expense of one's First Amendment rights. 99 F.4th 1243,

1253. That Defendant Brown, the City, other individual defendants, and other City employees disliked Martinez hiring an attorney and asserting claims cannot itself be a basis for disruption justifying his removal.

### (4) Fourth Pickering/Garcetti Element: Substantial/Motivating Factor

Martinez meets this element for two reasons: proximity and the Defendants' admission. "A plaintiff may demonstrate retaliatory motive by alleging his employer's knowledge of his First Amendment activity and close temporal proximity between the First Amendment activity and the alleged retaliation." *Littlefield v. Weld Cnty. Sch. Dist.*, No. 22-CV-02241-PAB-KAS, 2023 WL 6962087, at *9 (D. Colo. Oct. 19, 2023). On March 9, Martinez's attorney presented two documents to the Defendants setting forth his claims. The Defendant had knowledge of his First Amendment activity. Two days later, on March 11, they told him he could not serve as General Counsel. The second reason Martinez meets this element is the Defendants' implied admission at the March 11 meeting. At the start of the meeting, Smith told Martinez, "You know that you have had some matters that have been raised against the City." [Ex. 1, p. 2, ¶ 3].

### (5) Fifth Pickering/Garcetti Factor: Same-Decision Defense

Defendants have the burden to show they would have reached the same employment decision in the absence of the protected activity. *Pryor*, 99 F.4th 1243, 1253. Defendants notified Martinez that he would no longer serve as General Counsel within 48 hours of receiving the March 9 documents informing them of Martinez's claims. They could have made the decision before March 9, or they could have made it after; but they decided to take action almost immediately after receiving Martinez's March 9 submissions.

## 2. THE SECOND TRO REQUIREMENT: IRREPARABLE HARM

Martinez meets the second TRO requirement because he faces irreparable harm from Defendants' First Amendment violations. First Amendment violations cause irreparable injury.

*Pryor,* 99 F.4th 1243. "The potential loss of First Amendment freedoms, however small, establishes irreparable injury," *Pryor, citing Elrod v. Burns, 427 U.S. 347, 373 (1976).* Moreover, Martinez has lost his prestigious title, office, and status, and he is the subject of Defendants' stigmatizing statements in the media. If injunctive relief is not granted, his non-economic losses will continue to multiply. A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain. *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,* 269 F.3d 1149, 1156 (10th Cir. 2001).

### 3. THE THIRD TRO REQUIREMENT: BALANCE OF EQUITIES.

Martinez satisfies the balance of equities because he loses his job title, employment, reputation, and career prospects, while the Defendants lose nothing. The Defendants can show no harm in retaining Martinez as General Counsel.

### 4. FOURTH TRO REQUIREMENT: PUBLIC INTEREST

Marinez meets this element because the requested injunctive relief is not adverse to the public interest. The public interest here is the vindication of Martinez's constitutional rights. *Pryor,* 99 F.4th 1243, 1255 (10th Cir. 2024). *Calderon* explained: It's always in the public interest to prevent the violation of a party's constitutional rights, and vindicating First Amendment freedoms is clearly in the public interest. 2025 WL 2676046, at *8. [citations and quotations omitted].

**<u>CONCLUSION</u>**

Wherefore Plaintiff Martinez respectfully requests this Court to grant this motion and provide all relief requested herein.

Dated: March 30, 2026

*Steven L. Murray*

Respectfully submitted,

*/s/ Steven L. Murray*
Steven L. Murray
Murray Law, LLC
3900 East Mexico Avenue, Suite 300
Denver, CO 80210
Telephone: 303-396-9952
Email: steven@smurraylaw.com

Andrea F. Sobel
Brandon S. Armitage
Sobel Law, LLC
2000 S. Colorado Blvd. Bldg. 1
Suite 2000
Denver, CO 80222

Email Addresses:
andrea@sobel.law
brandon@sobel.law

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on March 30, 2026, the undersigned filed this pleading with the Court via the Court's ECF system, and the system will serve this pleading on attorneys who have entered an appearance.

The undersigned has served the following via email, with all exhibits referenced in the motion served with the motion.

To the Individual Defendants.

Michiko Brown
Michiko.Brown@denvergov.org
Nicole Doheny
Nicole.Doheny@denvergov.org
Jeff Dolan
Jeff.Dolan@denvergov.org,

To the attorneys with the Denver City Attorneys' Office who have been involved in this case.

Kathryn Smith
Kathryn.Smith@denvergov.org,

Robert Nespor
Robert.Nespor@denvergov.org,

Karla Pierce
karla.pierce@denvergov.org

*/s/Steven L. Murray*
Steven L Murray
Murray Law, LLC