**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-01100-SKC-KAS

EVERETT MARTINEZ,

Plaintiff

v.

CITY AND COUNTY OF DENVER,

MIKO BROWN, DENVER CITY ATTORNEY,
In her official and individual capacities,

NICOLE DOHENY, CHIEF FINANCIAL OFFICER FOR THE CITY,
In her official and individual capacities, and

JEFF DOLAN, CHIEF STRATEGIST FOR DENVER MAYOR
In his official and individual capacities.

Defendants.

_____

# EXHIBIT 1 – EVERETT MARTINEZ DECLARATION

_____

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-01100-SKC-KAS

EVERETT BEN MARTINEZ,

Plaintiff

v.

CITY AND COUNTY OF DENVER,

MICHIKO "MIKO" BROWN, DENVER CITY ATTORNEY,
    In her official and individual capacities,

NICOLE DOHENY, CHIEF FINANCIAL OFFICER FOR THE CITY,
    In her official and individual capacities, and

JEFF DOLAN, CHIEF STRATEGIST FOR THE MAYOR OF DENVER
    In his official and individual capacities.

Defendants.

---

**EVERETT BEN MARTINEZ'S SWORN DECLARATION**

---

I, Everett Ben Martinez, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. These statements are based on my personal knowledge of all statements and matters below.

1.  I am the General Counsel and Executive Vice President of Denver International Airport.

1

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

2. On March 11, 2026, the City required me to meet with Katie Smith, Acting Deputy Attorney, and Laura Coburn, Human Resources Director.

3. At the start of the meeting, Smith told me, "You know that you have had some matters that have been raised against the City."

4. Smith and Coburn informed me (a) I would no longer serve as General Counsel, (b) I had three options: resign, be removed, or be disqualified, (c) I have an attorney-client relationship with the City, (d) I had taken an interest in conflict with the City, and (e) I must withdraw from representing the City, which meant resign, be removed, or be disqualified.

5. Smith and Coburn did not inform me what interest I had or had taken, which was in conflict with the City.

6. Smith and Coburn did not inform me what conflict I allegedly had with the City or how or why the conflict came to be.

7. Smith and Coburn did not offer me any opportunity to respond to the basis of their decision, and they never explained the basis of their decision to me.

8. In the meeting, Smith made a vague reference to an opinion written by an attorney named Gleason. However, neither Smith nor Coburn informed me before or during the meeting what my specific interests were, which they viewed as in conflict with the City, or the precise conflict they viewed as existing between my alleged interest and the City.

9. The City has employed me as an attorney at the Airport since November 2016.

10. The City promoted me to Assistant General Counsel in April of 2020.

11. In June 2022, the City Attorney selected me as General Counsel in a nationwide competitive process.

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

12.   I supervise an in-house legal team (DEN Legal) at Denver International Airport consisting of twelve attorneys and five support staff members. Two attorneys, David Steinberger and Kevin Cain are my Assistant General Counsels.

13.   My employment is protected under the Denver Career Service program. I am not a political appointee.

14.   I am one of six Executive Vice Presidents at the Airport. I am the only Executive Vice President who is not a political appointee.

15.   I am (1) forty-six years of age, (2) Hispanic and Latino, and (3) a Colorado native. I have lived in Colorado my entire life, except for law school.

16.   I graduated from Harvard Law School. During my career with the City Attorney's Office, I have consistently earned positive or outstanding performance evaluations.

17.   I was recognized as the "Best General Counsel" by former DEN Chief of Staff and Former Deputy City Attorney, Cristal Tores DeHerrera, in her time with the City and then the Airport, which spanned three DEN general counsels, in a performance evaluation.

18.   I hold the Certified Member (CM) designation from the American Association of Airport Executives, reflecting specialized knowledge of airport operations and regulatory requirements.

19.   During my employment, then Mayor Michael B. Hancock and the City Council of Denver jointly selected me as their choice for the seat on the Denver Board of Ethics designated to be selected by both the mayor's office and the City Council in 2022. I served on the Board of Ethics from 2022 to 2025.

20.   In my role as General Counsel to Denver International Airport, I regularly advise on federal aviation law, FAA Grant Assurances, airport compliance matters, and FAA enforcement authority and the FAA's authority to impose fines and sanctions for noncompliance with their

3

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

regulations.

21. Miko Brown is the Denver City Attorney.

22. Nicole Doheny is the Chief Financial Officer for the City.

23. Jeff Dolan is the Chief Strategist for the Mayor, in his individual and official capacities.

24. Brown, Doheny, and Dolan are political appointees of Denver Mayor Mike Johnston.

## A. General Counsel Role

25. The Airport receives hundreds of millions of dollars in federal funding from the Federal Aviation Administration [FAA].

26. The FAA treats the Airport and the City as distinct legal entities. [Ex.]. When the FAA provides funds to the Airport, the City, which is designated as the airport sponsor under FAA legislation, must agree to a set of legally binding promises known as Airport Sponsor Grant Assurances. These grant assurances require the City to comply with federal aviation law and to protect airport property and revenue, ensuring they are used for airport purposes.

27. My responsibilities include providing legal opinions and advice to Airport leadership regarding compliance with these federal requirements and ensuring that transactions involving airport property comply with FAA grant assurances and federal aviation law.

28. My salary is paid entirely from the Airport's Enterprise Fund, not the City's General Fund, consistent with the FAA's treatment of the Airport and the City as separate entities for the purpose of enforcing the prohibition on revenue diversion against the sponsor. Based on my experience, payment of airport revenue for legal services could be subject to a potential finding of constituting to be an unlawful revenue diversion if it is

4

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

not for an airport purpose.

29. For the Park Hill real estate deal, the key FAA law is the revenue diversion rule, which prohibits the use of airport property or airport revenue for non-airport purposes unless strict conditions are met. Airport land and airport revenue must remain dedicated to airport purposes.

30.  Five parts of the revenue diversion rule and the FAA's enforcement authority apply to the facts and events in issue. First, the FAA, under the rule, requires the transaction to be an arm's-length transaction, meaning it must reflect normal market conditions between *independent* parties and accurately reflect the true value of the land. Second, an airport must receive fair market value if airport land is sold or used for non-airport purposes.

31.  Third, the FAA must approve the release of airport land for non-airport purposes. If airport land is proposed to be used for a non-airport purpose, the City, as the airport sponsor, must obtain FAA approval through a formal land release process.

32. Fourth, as part of the approval process, the FAA evaluates whether the proposed transaction meets federal requirements, including the prohibition on revenue diversion, the arm's-length transaction, and fair market value requirements.

33.  Fifth, the FAA requires full transparency regarding transactions involving airport property. Failure to provide accurate information may expose the airport sponsor to federal enforcement action.

34. If these federal requirements are violated, the FAA may impose significant enforcement consequences. These may include loss of eligibility for federal airport grants, withholding of federal funding, repayment of improperly diverted airport revenue with interest, and substantial civil penalties under federal aviation law.

35.  As General Counsel, my salary comes entirely from the Airport's Enterprise Fund,

5

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

an account separate from the City's General Fund.

36. The Airport's Enterprise Fund is self-sustaining and comprised of airport revenues, derived from the business activities of the airport (including, but not limited to parking, landing fees, and FAA funding) and is restricted under federal law and FAA grant assurances to be used for airport purposes only.

37. The City's General Fund (1) is supported by tax revenues and used for general governmental functions, and (2) does not fund the operations of the Airport, or my salary.

38. The Airport operates as an Enterprise Fund with legally restricted revenues under federal aviation law. My legal advice consistently addresses FAA compliance obligations affecting the Airport.

39. On several occasions related to these matters, political officials from the City tried to direct or influence actions affecting the Airport, including the Airport's proper role in communicating with the FAA. The political appointees tried to influence, including the timing and content of the Airport's communications with the FAA and the structuring of the transaction.

40. When those directives conflicted with federal compliance requirements or my legal judgment, my objections to these actions were based on my attorney-client relationship with the Airport, not the City, and my duty to exercise independent judgment and loyalty to the Airport and its leadership.

41. When I communicated legal risks in meetings attended by City officials, including Doheny and Dolan, I was doing so in my capacity as General Counsel to the Airport, and for the purpose of advising Airport leadership.

42. Under federal law, every dollar of airport revenue must be used exclusively for the Airport's capital or operating costs. 49 U.S.C. §§ 47107(b), 47133.

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

43.   Because the Airport operates as a federally obligated airport enterprise subject to FAA sponsor obligations, my legal work as General Counsel has historically been directed to the Airport and its leadership regarding airport operations, federal aviation compliance, and airport business matters.

44.   Throughout all of my time serving as an attorney with DIA, including the time serving as General Counsel, I have always operated in accordance with the following principles and understandings concerning my duties:

(1)  My attorney-client relationship is between the Airport leadership and me, not between the City and me or the political appointees in the Mayor's office.

(2)  The attorney-client privilege is between the Airport leadership and me, not between the City and me or the political appointees in the Mayor's office.

(3)  Only the Airport can waive this privilege.

(4)  Before I met with Katie Smith, Acting Deputy City Attorney, and Laura Coburn, Human Resources Director, on March 11, 2026, no City Attorney, Deputy City Attorney, or an Assistant City Attorney, a member of the Airport leadership, or a political appointee of the Mayor had ever advised me:

(a) My attorney-client relationship was with the City,

(b) My attorney-client relationship was not between the Airport and me,

(c) The attorney-client privilege in my role as an airport attorney was not between the Airport and me, but between the City and me.

(d)  In my role as an airport attorney and as General Counsel, I waived my rights to assert legal claims concerning my employment under federal and state law against the City and City officials under federal and state law.

7

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

45.  In my role as General Counsel to the Airport, my legal work was directed to the Airport and its leadership regarding airport operations and compliance with federal airport law, rather than to the City's political leadership.

46.  Throughout my tenure as an airport attorney at DIA and during my time serving as General Counsel, the legal advice I provided to the Airport regarding airport operations and FAA compliance was regarded as privileged communications belonging to the Airport and its leadership.

47.  In performing those duties, my professional responsibility required me to provide independent legal advice to the Airport leadership regarding compliance with federal airport law and FAA sponsor obligations, therefore giving me a duty of loyalty to the Airport.

48.  Throughout my nearly ten-year tenure as an Airport attorney, my legal work, advice, and opinions consistently focused on the Airport's leadership, the CEO, and operational needs. My legal advice primarily addressed the Airport's compliance obligations under federal airport laws.

49.  I have provided honest, well-reasoned legal advice and opinions consistent with the Colorado Rules of Professional Conduct.

50.  My understanding of these responsibilities was consistent with guidance provided to the Airport by specialized FAA airport counsel regarding the role of Airport General Counsel in matters involving federal airport law compliance.

**B.  <u>Washington, The Mayor's Office, and the Mayor's Political Appointees</u>**

51. Phil Washington, a Black man, is the Airport CEO. He is a political appointee, having been appointed by former Mayor Hancock.

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

52. On February 25, 2025, I met with Dolan at Yard House, a Denver restaurant.

53. Dolan told me Phil [Washington] called the Mayor "naïve". He wanted to know if I was there when that happened.

51. Dolan continued, "We (the Mayor's office) are aware of the things Phil has stated about the Mayor, and the Mayor isn't pleased." After this conversation, I came away feeling that Dolan was testing me out to see if I was on their [Dolan and Doheny] team against Washington.

52. On July 11, 2025, Doheny asked me to attend a video conference. On it, she expressed she struggled with her relationship with Washington and wanted to know how I thought things could improve.

53. I told Doheny what I had told the Mayor, the last two City Attorneys, Dolan, and Washington: They should all sit in a room and discuss their communication problems.

54. Doheny told me that she does not like Washington and had spoken to the Mayor multiple times about removing Washington. I told her that I am often in a bad spot because both sides used me to fight each other, and this was another case where it was implied that I should do something to remove Washington.

55. Doheny's request to meet with her about Washington was one of the many things the City and the Mayor's office were trying to get me to do, which is outside my scope of duties.

56. In May 2024, I learned the Mayor's Office wanted to swap Airport land for the Park Hill Golf Course. The Mayor's Park Hill Golf Course deal involved the City transferring land from the Airport to a private developer in return for the developer transferring land at the former golf course to the City.

9

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

57.  I did not oppose the concept of the Park Hill Golf Course land swap itself.  My role as General Counsel to the Airport was to advise on legal requirements governing the transaction and to ensure that any transaction complied with federal airport laws and FAA sponsor obligations.

58.  I performed my duties by advising Airport leadership, and in meetings attended by Dolan, Doheny, Kerry Tipper, the former City Attorney, Katie McLaughlin, the Acting City Attorney after Tipper left, and Brown, the current City Attorney, communicating the proper requirements imposed by the federal government and the severe penalties involved, for the Airport.

59.  Throughout 2024-2025, I provided analysis, legal opinions, and legal advice to the Airport leadership, identifying enforcement and financial risks for the Airport under the Federal Aviation Administration's [FAA] enforcement authority and related statutes and regulations associated with the proposed Park Hill land swap.

60.  My analysis, legal opinions, and legal advice to Airport leadership concerning the Park Hill land swap identified significant FAA Grant Assurance and Revenue-Diversion risks associated with the proposed Park Hill land swap.

61. My advice to Airport leadership included concerns regarding fair market value and arm's-length transactions requirements, Form 743 compliance, and the risks of concealing the ultimate transfer of airport land to a private developer from FAA review.

62.   I refused Brown's repeated directives to alter my legal analysis and opinions on various aspects of the Park Hill real estate deal or how the deal or parts of the deal were presented to the FAA or expressed concerns about potential legal and financial risks for the

10

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

Airport from FAA enforcement actions.

63.   On May 29, 2024, Deanne Durfee, the City Attorney's Office's Former Director of Municipal Operations Law and an attorney, told me that she believed the deal was impossible, and asked for my opinion.

64.   I agreed with Durfee because I found the transaction was likely textbook Revenue Diversion, a third rail concern for the FAA. Durfee told me the Mayor wanted the deal closed by his first State of the City speech on July 22, 2024.

65.   Additionally, Durfee and I discussed the 1988 Intergovernmental Agreement, which is an agreement among Adams County and surrounding local government entities. This agreement originated with the inception of the new Denver airport project and the related annexation of land involving Adams County and surrounding local government entities.

66.   The Intergovernmental Agreement imposes binding land use and noise compatibility requirements on the City and County of Denver and neighboring jurisdictions to safeguard the Airport's operations.

67.   Durfee and I discussed whether the Intergovernmental Agreement could restrict or condition the sale of airport land, including whether it would require approval of the parties or only allow for long-term leasing structures, which we believed it did. We both understood the agreement to impose constraints on the transfer of airport land without such prior approvals.

C. **The Revenue Diversion Rule**

68. The FAA's Revenue Diversion is straightforward in its rule that prohibits cities from diverting airport-generated revenues to non-airport purposes. Under the rule, the City cannot use airport-generated revenue for any purpose other than the capital or operating costs of the Airport. Two federal statutes establish this requirement.

11

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

69. First, 49 U.S.C. § 47107(b) conditions federal grant eligibility on the City's assurance that airport revenues will be used exclusively for airport purposes. Second, 49 U.S.C. § 47133 imposes the same obligation directly on the City, the sponsor, independent of any grant agreement.

70. The FAA enforces these provisions, in part, through Grant Assurance 25, which implements the two statutes above. Grant Assurance 25 remains in effect without any expiration date for as long as the Airport is used as a public-use airport. The City cannot negotiate around it.

71. Through its statutory and regulatory authority, the FAA has civil enforcement authority, including the power to impose severe measures, such as loss of federal grant eligibility, withholding of funds, and civil penalties equal to three times the amount of the illegal diversion, plus interest.

72. Denver International Airport relies on federal Airport Improvement Program grants for significant portions of its capital infrastructure projects. Loss of eligibility for those grants could have substantial financial consequences for the Airport.

73. As the Airport's General Counsel responsible for advising on FAA compliance, it was part of my professional responsibilities to identify and advise the Airport regarding potential Revenue Diversion risks.

74. I have a professional and legal duty to monitor, identify, and address potential Revenue Diversions and violations of FAA rules and statutes under its jurisdiction.

## D. The Mayor's Appointees Push the Deal

75. In the spring and summer of 2024, Doheny and Dolan began holding meetings and taking action to close the swap.

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

76. I met with the Airport legal team, airport officials, and employees. We analyzed the legal risks, the Revenue Diversion issues, and any lawful justification the City could offer the FAA for the Airport's acquisition of a golf course, which was the City's initial directive.

77. I had extensive discussions with Kaplan Kirsch, a law firm frequently retained by the Airport as outside counsel. [Kaplan Firm].

78. The Kaplan Firm is nationally recognized as a legal expert in airport law.

79. At no time did the Kaplan Firm advise me that my legal opinions/advice concerning the real estate deal were wrong.

80. Because of the Intergovernmental Agreement, I communicated to Doheny and Dolan, in the course of advising the Airport, that proceeding with the Park Hill deal without obtaining a vote by the City and County of Denver, Adams County, the City of Aurora and the City of Brighton, or without a obtaining a waiver from those municipal parties, could violate that agreement.

81. In response to my warning, to my knowledge, the City took no action to initiate such a vote or obtain a waiver of the IGA provisions.

82. Doheny and Dolan decided the Airport would sell its land to the City via an internal book transfer, and the City would immediately swap it to the developer who owned the Park Hill Golf Course.

E.  **The Required FAA Form 743 Process**

83. When a federally obligated airport proposes to dispose of airport land or transfer property interest, the FAA typically requires submission of FAA Form 743.

84. The Airport must confirm the deal complies with Grant Assurances, meaning the Airport receives fair market value in an arm's length transaction, the proceeds of the sale remain

13

with the Airport, and there is no Diversion of Revenue from the sale to the City for non-Airport purposes.

85. In October 2024, David Steinberger, an attorney on my team, submitted the first Form 743.

86. Before Steinberger did so, we [Steinberger and I] advised Airport leadership and communicated to Dolan and Doheny that submitting a Form 743 at that time, when there was no specific parcel identified, made the submission premature. As a result, the City was not telling the FAA the exact land the Airport intended to sell, and the FAA could view this as misleading, incorrect, and inaccurate information, and subjected the City to penalties.

87. I understood that any penalties or enforcement actions arising from inaccurate or misleading information submitted to the FAA would be imposed on the City and County of Denver, as the sponsor, and could result in financial liability to the City, including impacts on its General Fund.

88. Doheny and Dolan ignored my warnings. Doheny told Steinberger to file the Form 743 anyway.

89. Throughout this period, I spoke regularly with Kerry Tipper, the former City Attorney. I explained that my legal team and I felt increasing pressure from Doheny and Dolan, and I outlined the Revenue Diversion risks and IGA hurdles.

## F. The Concealment Directive

90. Doheny, Dolan, and their team structured the deal to allow the Airport to transfer airport land to the City, and the City would immediately hand it to the developer.

91. Tipper, the former City Attorney, told me to tell Washington that the Mayor preferred the FAA not be told about the private developer's involvement. That involvement was that the private developer would be the ultimate owner of the airport's land in this deal, instead of the

14

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

City.

92. The private developer who would become the ultimate owner of the airport land is Westside Investment Partners, the then owner of the Park Hill Golf Course.

93. Beginning in the summer of 2025, Doheny told Washington, Steinberger, and me, more than once: "The Mayor does not want FAA to know about the Westside step."

94. I understood Doheny's directive regarding the "Westside step" to refer to the planned transfer of the airport land from the City to the private developer (Westside Investment Partners) immediately after, the Airport transferred the land to the City.

95. I understood Doheny's directive to be a direction to conceal a material fact from the FAA.

96. Compliance with Form 743 and its related approval process requires accurate disclosure of the parties and consideration involved in any airport land transaction so the FAA can, in part, evaluate whether the Airport is receiving fair market value and whether the transaction complies with federal prohibitions on revenue diversion. If a transaction is structured to transfer land to the City on paper while the actual beneficiary is a private developer, and that fact is not disclosed to the FAA as a material fact, the FAA's review is based on incomplete or inaccurate information. This creates a risk that the transaction will be deemed noncompliant, including potential findings of revenue diversion, loss, or withholding of federal funding, as well as exposure to civil penalties.

97. I refused to follow the Mayor's, Doheny's, and Tipper's directive to conceal material information from the FAA.

98. I did not conceal the developer's role in the real estate deal from the FAA.

99. I did not conceal any material fact from the FAA.

15

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

## G.  The Mayor's Premature Announcement

100.   On January 15, 2025, the Mayor held a press conference at the Park Hill Golf Course and announced the City had acquired it.

101.   At that point, the Purchase and Sale Agreement had not been signed, the FAA process was not finished, and the City Council had not voted on the deal. The Mayor's announcement, without the completion of these items, was problematic because City funds were allocated to maintain the park from that point onward, without actual ownership having occurred. If the FAA became aware that the Golf Course was being received as a trade for Airport land, inconsistent with what was disclosed on Form 743, they could very well audit the Airport on all funding matters in the future.

102.  I asked Dolan why he [the Mayor] did the early announcement, as it might raise serious concerns with the FAA (given nothing was final). Dolan responded that the Mayor was having a tough month and needed a win.

103.   Meanwhile, Tipper took maternity leave and left the City. Katie McLaughlin became Acting City Attorney. She began attending meetings on the golf course land swap deal.

104.   McLaughlin held meetings with the Kaplan firm without telling Steinberger or me.

105.   McLaughlin's actions risked damaging our credibility with the Kaplan firm and prevented us from obtaining all relevant information, which we were legally responsible for managing.

106.   I became aware of McLaughlin's activities when my office received bills from the Kaplan Firm for line items, noting meetings with Kirsch, McLaughlin, and Doheny.  I spoke to Kirsch about this in February 2025, and he said he was being put in a difficult position between

16

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

the City and the Airport.

107. During my nearly decade with the Airport as an attorney, I had never witnessed any City Attorney, Acting City Attorney, or Assistant City Attorney interfering or intervening in the Airport attorneys' relationships with outside counsel.

## H. The Below-Market Appraisal

108. A central part of the FAA's Form 743 review process is determining whether the Airport is receiving fair market value in an arm's length transaction and whether the transaction complies with federal revenue diversion rules.

109. I explained, in the course of advising the Airport, and communicated to Doheny that conducting this transaction in which the Airport received less than fair market value for the land would bring unnecessary risk to the Airport. I objected to the Airport not receiving fair market value and the submission of an inaccurate Form 743.

110. My objection was based on the transaction for less than fair market value, violating the federal prohibition on the diversion of airport revenue under FAA grant assurance, and the FAA could impose severe penalties for this offense.

111. Doheny and her team controlled the appraisals used to determine the value of the given Airport land. Doheny and her team did not involve the Airport in her appraisals, despite the Airport having previously appraised the same land, with the Airport's appraisal being delivered to the FAA in 2020.

112. The Airport had told the FAA in 2020 that the land was worth $3.25 per square foot. The City's appraisals came in at $1.70 in 2024 and $1.65 in 2025. That is approximately a 50% reduction.

17

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

113.   The difference between the Airport's previously reported appraised valuation of the parcels and the City-controlled appraisals raised concerns about whether the transaction would satisfy FAA fair market valuation requirements and be viewed as an arm's-length transaction.  The substantial differences between the City-controlled appraisals and the $3.25/sq ft appraisal previously reported by the Airport to the FAA formed one of the bases for my objections.

114. Black's Law Dictionary defines an "arm's length transaction" as a "transaction between two unrelated and unaffiliated parties, each acting in his or her own self-interest." Dohney, as a member of the City government, controlling the appraisals for the land she wished to purchase from the Airport to set the price of such a sale, seemed to run contrary to this transaction occurring at arm's length for fair market value.

115. Doheny was not concerned with the prior appraisal or my warnings about the penalties associated with a transaction below fair market value.

116. Doheny told me: "The [Airport] is a place, not a thing, under the City. And I am the CFO of the city; we own that land, and it's my call."

117. I explained to Doheny: (1) the federal government did not see it the same way; (2) the FAA treats the Airport as a distinct entity; and (3) the Revenue Diversion rule (including the need for the airport to receive fair market value in an arm's length transaction), is serious and violations carry the risk of enormous financial sanctions.

118. Doheny and her colleagues ignored my objections and proceeded with the deal based on their numbers, not the higher Airport numbers.

**I.    The Order Not to Keep Records**

119.   On August 6, 2025, McLaughlin called me at home at 7:09 p.m.

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

120.   During this call, she directed my team and me not to create or retain any records related to the Park Hill real estate transaction. She stated, "Keeping records would scream treble damages to the FAA."

121.   In prior discussions, McLaughlin had expressed concern about potential exposure under the federal False Claims Act 31 U.S.C. § 3729-3733, which allows for treble damages. Based on those discussions, I understood her reference to "treble damages" to be referring to that statute.

122.   I documented the call and immediately called Steinberger and Cain, two attorneys on my team, and Washington. I told them to keep records of everything. Later, I told my entire DEN Legal team that if anyone, including me, ever told them not to keep a record, they still have a duty to keep one.

123.   I did not follow McLaughlin's directive to "keep no records" regarding the real estate deal.  I refused to tell my team and the airport not to keep or take notes.

## J. **The 20-Acre Expansion**

124.  City Council approved a 145-acre swap in May 2025. Then, the developer demanded 20 more acres.

125.   On August 19–20, 2025, Steinberger and I told McLaughlin the additional transfer of 20 acres to the third-party developer needed separate Council approval, per the City Charter.

126.   Under the Denver City Charter, the sale or disposition of City-owned real property requires approval by ordinance of the City Council. It cannot be effectuated unilaterally by the executive branch.

127.   The City Council never approved the additional 20 acres provided to the developer.

128.   I also told Doheny and Dolan that the transaction required a second Form 743 from the Airport to account for the additional 20 acres, but Dolan resisted.

19

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

129.   Dolan argued that the time required for the FAA's review would jeopardize the timing of the Mayor's Bond initiative on the ballot, as funding for the Park was part of the bond question before the voters.

## K.  My Application for City Attorney Position & Non-Selection

130. I applied for the open City Attorney position.

131. A panel interviewed me on July 18, 2025. Dolan was present even though he was not on the panel.

132. I advanced as one of the final three candidates for the position.

133. I interviewed with the Mayor and Jenn Ridder, the Mayor's then-Chief of Staff and now the current Chief of Staff, after a break in service.

134. I used the interview to raise the alarm: the situation at the Airport was serious and needed to be fixed, as Doheny's relationship with Washington's was harming the business operations at the Airport, and the attorneys [Steinberger and I] were being tasked with dealing with the fallout thereof, like their children in a bad divorce.

135.   In my interview, Mayor Johnston asked me how to fix the problem between Washington, Doheny, and Dolan. I provided the same explanation I had with Dolan, Tipper, Doheny, and McLaughlin previously: they needed to sit down and discuss their differences and no longer use the lawyers as pawns in their battle.

136. On July 30, 2025, Ridder told me I was not selected. She added: "The Mayor wanted [me] to specifically know that he is aware of all of the help you have provided to Jeff (Dolan) and Nicole (Doheny) at the Airport."

137. Brown became City Attorney on September 1, 2025.

20

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

138. As of September 1, 2025, the City and Airport leadership had never advised me of any concern or problem with my performance or conduct that placed me in jeopardy of being removed as General Counsel and losing my employment with the City.

139. Four days later, on September 5, 2025, I sent Brown a comprehensive memorandum addressing the legal issues surrounding the golf-course land transfer and my concerns. Steinberger followed with a second memorandum to Brown on September 8, 2025.

**L.   City Denied My Recommended Pay Increase & Reclassification of Position.**

140.  On April 7, 2024, the Airport CEO and the former CFO recommended that I be promoted from EX-21 to EX-22.

141.  Kerry Tipper received this recommendation in April of 2024, but no action was taken until September of 2025.

142.  In September 2025, McLaughlin, Brown, and the City denied me this pay raise and a reclassification of my position to EX-22, Executive Vice President to the Airport, a role I hold in addition to my General Counsel position.

143.  On December 22, 2025, the Airport's current CFO confirmed the recommendation as I considered appealing the City's decision not to grant me the raise and reclassification.

144.  Washington had recommended the pay raise and reclassification; the former Chief Financial Officer for the Airport and the current Chief Financial Officer for the Airport are my clients, and my compensation is paid entirely out of the Airport's Enterprise Fund.

145.  I raised the issue of Kerry Tipper not responding to the recommendation that I received with Dolan on August 12 and 27, and September 2, 2025.

146.  Every other EVP at the Airport is classified as EX-22.

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

147. I am the only EVP at the Airport who is not classified as EX-22, and I am the only EVP who is not a political employee.

148. The pay gap is approximately $50,000 per year.

149. The average EVP salary in 2024 was $273,337. My 2026 salary is $225,358.56.

150. The City denied my recommended pay raise and reclassification without any explanation, while acknowledging that my EVP responsibilities made the requirements of my job more than those of other Directors or General Counsels.

## M. Personal and Professional Disparagement

151. Starting in September 2025, right after Brown became City Attorney, Brown and the Individual Defendants began their targeted retaliation and discrimination against me once she received my memorandum dated September 5, 2025, expressing my legal concerns and objections regarding the Park Hill land transaction.

152. On September 19, 2025, I received a call from Peter Kirsch of Kaplan Kirsch, who told me (1) Doheny had called angrily, and asked Kirsch to "yell at" me regarding my advice to the Airport regarding the need for the Airport to complete an additional Form 743 to account for the additional 20 acres, and (2) Doheny made "outrageous accusations" about me "personally."

153. I have a long-standing professional relationship with Mr. Kirsch.

154. Throughout the events in dispute, Mr. Kirsch has been supportive of the quality and accuracy of my legal advice to the Airport and well-reasoned opinions.

155. I complained to Brown about Doheny's conduct.

156. Brown refused to address Doheny's behavior. Instead, she was upset with Kirsch, the outside lawyer, because he had told me about Doheny's comments.

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

**N.  Sabotage & Obstruction Accusations**

157. I also complained to Brown that two attorneys on the Airport legal team overheard a call she was having with Dolan on speakerphone, the previous week, during which Dolan stated: "David [Steinberger] and Everett [Martinez] are actively sabotaging this transaction, and Mike (the Mayor) has taken notice."

158. When I confronted Brown, she first denied it; then she called Steinberger an "obstructionist," said she was "not quite at the point of getting rid of him, yet" and that I was being "lumped in with Phil Washington and the Airport."

159. From that point on, at every meeting except once, Brown told me: "You and David [Steinberger] need to fix the relationship with [Dolan and Doheny]. If you don't, something is going to happen."

**O.  The FAA Responds with Concerns Re: Park Hill Land Deal**

160.  On October 18, 2025, local media reported on the land deal.

161.  The FAA took notice and contacted Washington and the Airport's Chief Operations Officer by telephone. The FAA's Airport District Office head warned that future grants were at risk due to the City's immediate transfer of the original 165 acres to the private developer, without notifying FAA of the ultimate owner, and regarding the yet to be approved additional 20-acre transfer being discussed in the media as a completed, but without FAA approval.

162. The FAA also discovered that Steinberger had sent the original Form 743 to the wrong email address. I was not made aware of this mistake until this time.

163. I notified Brown that the FAA had contacted the Airport and made known to its leadership that future grants might be at risk due to the FAA's discovery of the secondary

23

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

transfer to the third-party developer and an additional transfer of 20 acres, only through the media.

164. Brown replied: "Well, they [Doheny and Dolan] can't say you didn't warn them."

165. The next day, Brown changed her position and blamed me for the FAA questioning the real estate swap. She told me, "You and David [Steinberger] should have done a better job communicating the risk to the Airport to [Doheny and Dolan]."

166. At this point, Brown emailed Washington and me, demanding to be included in all future FAA discussions, along with Dolan and Doheny. This directive threatened to compromise the attorney-client relationship among Washington, the Airport, and me.

167. In all of my years as an attorney for the Airport, no City Attorney, Acting City, or Assistant City Attorney has made such a demand on behalf of the political appointees of the Mayor.

## P.  The City Attorney Leadership Retreats

168.  At a retreat on October 31, 2025, a colleague jokingly asked if the Mayor wanted to "fire everyone." Brown looked directly at me, stating, "Actually, I'm sure there are a few people he'd love to get rid of."

169.  At another retreat, she spent over an hour publicly berating a Director of a section of the City Attorney's Office in front of the other Directors until the Director was in tears, curled up in a near-fetal position.

## Q.  Key Lime Airlines

170. In late December 2025, the City Council decided to reject an ordinance to lease space to Key Lime Airlines, a small airline at the Airport. The Council opposed Key Lime's lease of space at the Airport because the airline transported individuals, on behalf of the Trump

24

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

Administration, who were subject to deportation based on their immigration status, according to the Council's public statements.

171.   Before the Council's decision, the Airport's legal team advised the Council, through the Council's attorney, of the FAA's position that discrimination against an airline is only permissible for safety reasons.

172.   The Council recognized and confirmed receiving the Airport legal team's advice, through their own counsel, during their public vote. With this information, the Council voted against the lease.

173.   On January 6, 2026, I met with Washington and other senior Airport officials; Brown attended via video conference.

174.   During this meeting, Brown asked the Airport leadership and the Airport legal team, "Do you all investigate airlines for safety violations?"

175.   The SVP of Airline Affairs said that the Airport does not, as it is a function of the FAA, not an airport.

176.   Brown replied, "Well, you all should investigate Key Lime yourselves."

177.   I objected to Brown's directive. I stated that it was very clear in the City Council's public statements on their "no" vote that the reason the Council voted "no" was the deportation issue.

178. Brown replied, "If the FAA comes knocking, I want to be able to have in my back pocket that [the] Council was also voting [no] because of safety issues, but [they] ran out of time to get to talking about that before voting."

179. After the meeting, I consulted with the Airport team and stated that Brown's directive about creating an after-the-fact investigation to present to the FAA was illegal. I viewed Brown's

25

directive to create an investigation into Key Lime's safety record as equivalent to fabricating evidence after the fact, since any evidence derived from such an investigation did not exist before the City Council voted against Key Lime's lease request, due to its immigration transportation services.

180.  I refused to participate in conduct that would have allowed Brown to have a false justification for a safety investigation after the fact, as the reason for the City Council's denial of the lease for Key Lime.

181.  On January 12, 2026, Steinberger reported that he had met with Brown on January 9, 2026, to discuss again the safety investigation she had recommended on January 6, 2026, with the Airport and DEN Legal team.

182.  Everyone on the DEN Legal team and Senior officials of the Airport all agreed with me that Brown's directive is highly illegal and unethical, and that having that other safety reason in "our back pocket," as Brown put it, is wholly inappropriate and illegal, and they should not follow that directive.

## R.  **FAA Scrutiny**

183. On December 31, 2025, the FAA submitted a letter to Washington. The FAA states:

> The Federal Aviation Administration (FAA) is writing to express concerns regarding the recent action taken by the Denver City Council regarding City Council Bill 1938 to deny approval of a proposed airport lease for Key Lime Air Corporation at Denver International Airport. Based on information currently available to the FAA, the stated rationale for the lease denial appears to be unrelated to airport operational, safety, or capacity considerations. Instead, it is based on opposition to the tenant's aeronautical activities.

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

## S. Events After FAA Notice

184.  On January 2, 2026, Emily Garnett, the Mayor's former Acting Chief of Staff and the current Chief Operating Officer for the City, reached out to me to say that Council President Amanda Sandoval wanted to speak with me after a discussion among Garnett, Sandoval, and Angela Casias, the Mayor's Legislative Director, about the implications of the no vote.

185. On Saturday, January 3, 2026, Sandoval called me and asked a few questions about FAA Grant Assurance 22, which prevents discrimination of air carriers, and for some literature explaining the grant assurance program.

186.  I told Sandoval I read the transcript of the Council's vote and related discussion.

187.  I provided my understanding of the matter and objection to Sandoval: stated the legal opinion my office previously provided to the City Council's attorney, and my thoughts upon reading the transcript: (1) voting down an airline agreement for any non-safety reason would be an enormous problem, (2) it seemed some Council members thought voting no would cost the Airport only a single grant, which was not correct, (3) the action could cost the Airport all grants in the future,

188.  The FAA has the authority to stop all pending grants and prevent DEN (Airport) from receiving future grants until the discriminatory act is rectified.  There is a possibility they could claw back grants already received, meaning money that has already been deposited.

189.  Sandoval asked me about the amount of money at issue. I replied, "That's for DEN Finance and Nicole Doheny to answer. I can only guess, and we have been told by Miko [Brown] that if we thought Nicole would want to be involved in a matter, we need to make that known."

27

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

190.   Brown had given the directive about Doheny's involvement to the entire City Attorney's Office on a town hall call.

## T. **January 7–8, 2026:  Critical Stage of Retaliation & Discrimination**

191. On January 7 and 8, 2026, Brown's retaliation and discrimination against me reached a critical point.

192. In a meeting with me, Brown:

> (1)   Told me I had "zero credibility," and that I was "full of shit."

> (2)   Brown told me, at least four times: "Maybe this isn't the place for you."

> (3)   Brown demanded I "come clean" to Dolan and Doheny, in writing, about "all the wrong you have done."

193. Brown's demand for me to "come clean" was a demand that I falsely confess in writing that my advice on the real estate deal to Washington was wrong or improper, as it went against the political desires of the Mayor's office.  Outside FAA counsel to the Airport confirmed my advice was correct.

194.   My refusals to follow all the directives in this declaration were based on my professional judgment that compliance could breach my obligations under the Colorado Rules of Professional Conduct and relevant federal law.

195.   Brown waved around what she called a "mystery email" in which I had supposedly offered to "kill the deal," referencing the Park Hill real estate swap deal.

196.   Brown did not show me the email in the meeting. She provided me with the email a month later, in February 2026.

197.   I never offered "to kill the deal" or took action to "kill the deal." The email was written a year and a half before Brown was hired.

28

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

198. Brown misinterpreted the email. The email reflects my advice to Washington on how to protect the Airport from a transaction that likely violated federal law and involved an entirely different parcel of land than the one actually used in the Park Hill transaction. This function is a central part of my job.

199. Brown admitted she had given the email to Dolan and "he has it on his computer, right now".

200. In doing so, Brown took a privileged attorney-client communication between the Airport's CEO, Washington, and me, and delivered it to Dolan, a political operative, to attempt to coerce a false confession from me, the attorney who wrote the document.

201. Brown stated, "If you don't do this [confess in writing to Dolan and Doheny], I will formally discipline you for this email we found in December" [referring to the legal advice I provided to Washington in June of 2024].

202. Brown then stated: "If you can get on board with Dolan, Doheny, and me, then we can take care of [Washington] together."

203. Brown then ended the previous statement by saying to me, "or get a noose and hang yourself with it" if I did not want to get "on board" with their plan to "take care of." Washington.

**U.   Human Resources Complaint & Subsequent Events**

204. On January 13, 2026, I submitted a written document to the Office of Human Resources [OHR] in which I notified the Executive Director of OHR and the City Attorney's Office Representative to OHR that Brown and the Mayor's Office were retaliating against me.

205. Due to the Defendants' treatment of me, including the actions of Doheny, Dolan, Brown, her predecessors, and Katie McLaughlin, from May 24, 2024, to January 13, 2026, I

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

experienced increasing anxiety, fear of losing my job, and worry. After Brown became the City Attorney in September 2025, the emotional toll and worry intensified as her pattern of retaliatory actions against me began once I delivered the memo expressing my concerns about the Park Hill land transaction to her.

206. These retaliatory actions became more severe starting on January 13, 2026, when I filed my complaint with the human resources office, and continued through March 11, 2026, when I was told I would be removed from my role as General Counsel to the Airport and lose my employment. As a result, I have suffered heightened worry, anxiety, and fear about my professional future.

207. My OHR complaint addressed these issues: (1) the City's directive to conceal material facts from FAA Sponsor-controlled appraisal and valuation override; (2) the City's instruction not to create or retain records; (3) the City's dispute with the FAA requirement Second Form 743 dispute and political pressure; (4) the City's private communications with airport outside counsel; (5) Brown–Dolan call referencing the Mayor and allegations of sabotage; (6) flagged Brown's Key Lime Airlines directive; and (7) the City's interference with airport outside counsel and reputational harm.

208. On January 24, 2026, and 25, 2026, Brown accused me of poor management of Steinberger on matters regarding Park Hill and Key Lime.

209. Brown held meetings with Steinberger, directing him to tell the Airport's leadership again to investigate the safety records of the airline, as a post hoc reason "to give to FAA" for the City Council's no vote. Brown excluded me. Then, she blamed me for not supervising Steinberger on the Key Lime matter.

30

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

## V.   Lowest Performance Evaluation of Career

210. On or about January 21, 2026, after filing my OHR complaint, I received the lowest evaluation of my career.

211. Brown was the City Attorney and head of the CAO.

212. This was the only evaluation I ever received that included a "development needed" rating on a performance element.

## W.   Meetings on February 11, 2026 & February 20, 2026

213. On February 11, 2026, during a scheduled "check in" meeting with Brown and me, in the presence of her Deputy City Attorney (whose attendance was required by OHR), Brown stated that she did not want to talk about the legal work my team was undertaking (the standard purpose of such check ins), but rather to again discuss the "come clean" in writing directive and me not supporting her directive to the Airport and my team to investigate Key Lime Air, post hoc, as a stated reason to give to FAA for the City Council's no vote, a month after she knew about the OHR complaint.

214. On February 18, 2026, the Director of Human Resources met with me in person. He told me that I would be separated from direct contact with Brown because Brown "had lost her mind" in the February 11, 2026, check in meeting, as witnessed by the Deputy City Attorney.

215. Despite those assurances, Brown scheduled a one-on-one with me for March 11, 2026.

## X.   My Protected Activity Through Counsel

216. On February 20, 2026, my attorney submitted a letter to Brown, Doheny, Dolan, and the Office of Human Resources. The letter stated:

31

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

(a)   Mr. Martinez has several compelling legal claims against the City and County of Denver and City officials (elected or otherwise), in their individual capacities, including Ms. Brown, Ms. Doheny, and Mr. Dolan.

(b)   Mr. Martinez's claims include, but are not limited to, claims under these statutes and provisions:

(c)   Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 [Title VII].

(d)   Colorado Anti-Discrimination Act, as amended, C.R.S. §§ 24-34-401 to 406 [CADA].

(e)   Discrimination claims under 42 U.S.C. § 1981, to be asserted under 42 U.S.C. § 1983.

(f)   Claims for violations under the First and Fourteenth Amendments of the United States Constitution, to be asserted under 42 U.S.C. Section 1983.

217. The February 20, 2026, letter also stated:

(1)  City's Retaliation Against Mr. Martinez is Unlawful

(2)  This statement is protected activity under Title VII, CADA, Section 1981, and the First Amendment of the United States Constitution.

(3) The above provisions prohibit the City and City officials, supervisors, managers, and employees from retaliating against Mr. Martinez for submitting his claims herein.

218.  The February 20, 2026, letter explained the document was protected activity and may be used in future proceedings against the City and City officials.

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

## Y.  February 20, 2026 - March 9, 2026

219.  The City's OHR department retained an outside attorney to investigate my OHR complaint. The retained counsel wanted to interview me.

220.  On March 9, 2026, my attorney submitted two documents to counsel, in consultation with OHR's retained counsel: (1) a letter outlining my claims and (2) a comprehensive position statement with legal authority and exhibits.

221.  The March 9, 2026, documents set forth my claims. The position statement repeated the retaliation language in the February 20, 2026, letter.

## Z.  City Informs Me I Can No Longer Serve as General Counsel

222. On March 11, two days after my attorney sent letters setting forth my claims, the Deputy City Attorney and the OHR Director called me into a meeting and told me:

(1)  I could no longer serve as General Counsel.

(2)  I had an attorney-client relationship with the City.

(3)  At the same time, the Deputy City Attorney referred to the Airport and its employees as "your client" two times, in the context that I was not supposed to contact them during my time on leave.

(4)  I have taken an adverse interest against the City, and I must withdraw from representation, meaning I could no longer hold the General Counsel position.

(5)  The City placed me on administrative leave for seven days, and if I did not resign, the City would remove me.

223.  Until I raised the above legal concerns and reported them internally, and through my attorney, no one had suggested that my role as General Counsel to the Airport posed any conflict that would prevent me from performing my duties.

33

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

224. This was the first time the City claimed that asserting legal rights or reporting misconduct created a conflict preventing me from serving as General Counsel to the Airport. Throughout my career, my legal work has focused on the Airport and its leadership, addressing federal airport law compliance and airport operations.

225. Throughout my career as an Airport attorney, I have always operated and performed my duties with the sound understanding that I have an attorney-client relationship with the Airport.

## AA. March 18, 2026

226. On March 18, 2026, I filed my Complaint and Request for Jury Trial.

227. On March 18-19, 2026, the City began submitting statements to the media alleging that statements in my Complaint violated the City's attorney-client privilege.

228. On March 19, 2026, the City changed my status from administrative leave to investigatory leave. I viewed the conditions of the initial investigative leave as restrictive, retaliatory, and punitive.

229. The City has never told me the reason why it changed my status from administrative leave to investigatory leave.

230. On March 24, 2026, I filed my First Amended Verified Complaint and Request for Jury Trial.

231. On March 24, 2026, the City modified the term of my investigative leave by removing the stay-at-home component.

232. I view the remaining terms of the modified investigatory leave as retaliatory, restrictive, and punitive.

34

Docusign Envelope ID: 110CEF86-D345-422A-A835-1169D0419C3B

233.    The City has not told me why it modified the terms of my investigative leave.


## **VERIFICATION**

I, Everett Ben Martinez, declare under penalty of perjury under the laws of the United States of America, including 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed on Wednesday, March 27, 2026, in Denver, Colorado.

Signed by:

*Everett Martinez*                3/27/2026

F3DDAD07B4D6417...

Everett Ben Martinez

35