**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-01100-SKC-KAS

EVERETT MARTINEZ,

Plaintiff

v.

CITY AND COUNTY OF DENVER,

MIKO BROWN, DENVER CITY ATTORNEY,
In her official and individual capacities,

NICOLE DOHENY, CHIEF FINANCIAL OFFICER FOR THE CITY,
In her official and individual capacities, and

JEFF DOLAN, CHIEF STRATEGIST FOR DENVER MAYOR
In his official and individual capacities.

Defendants.

_____

# EXHIBIT 5 – MARCH 9 ATTORNEY POSITION STATEMENT

_____

# *Murray Law LLC*

---

*Via Email Only*

CONFIDENTIAL SETTLEMENT COMMUNICATION
PURSUANT TO FED. R. EVID. 408 and CRE 408

March 9, 2026

David D. Powell Jr.
Garnett Powell Maximon Barlow & Farbes
1125 17th St., Suite 2200
Denver, CO 80202
Email: david.powell@garnettlegalgroup.com

**Re:  Everett Martinez and Denver International Airport, City and County of Denver**

David:

## **INTRODUCTION**

We represent Everett Martinez regarding his employment as the General Counsel and Executive Vice President for the Denver International Airport.

Denver International Airport/Department of Aviation (the "Airport") is a department within the City and County of Denver (the "City").

The Airport's legal team is also called DEN Legal, one of six sections of the City Attorney's office.  Martinez is the Director of DEN Legal, which is the Airport's legal team.

Martinez loved his job until the events described occurred.

Martinez's employment is protected under the City's Career Service program and rules, and he is not a political appointee.

Martinez is forty-six years of age. He identifies as Hispanic and Latino.

---

**Steven L. Murray**
Attorney at Law
3900 East Mexico Avenue • Suite 300 • Denver, CO 80210
T. 303-396-9952 • Email. steven@smurraylaw.com • www.smurraylaw.com
*Admitted to practice in Colorado, Illinois, and the District of Columbia*

1

The City has employed Martinez as an attorney at the Airport for over nine years. He has served as the Airport's General Counsel since 2022. [Ex. 1 (job duties)].

Martinez has sterling legal credentials and an accomplished record of service with the Airport.

Martinez graduated from Harvard Law School. During his employment with the City, he has consistently earned outstanding performance ratings. He is a national leader in airport law.

Before Martinez was named General Counsel, on or about December 16, 2021, Mr. Martinez was physically assaulted by Scott McCoy, his supervisor.

McCoy was the General Counsel and Executive Vice President of the Airport. McCoy is a White man.

The assault occurred at the Airport's holiday party. During the event, McCoy intentionally hit Martinez in the face while role-playing. He explained he was portraying how a Black man might resist arrest and provoke an officer.

Kristin Bronson, the then City Attorney, took no action against McCoy. Martinez is not aware of the City imposing any discipline on McCoy. McCoy resigned.

On the day of the attack, Bronson told Martinez he did not have to come to work the next day if he felt uncomfortable. No one in Airport leadership or the City Attorney's office offered Martinez any support.

Martinez is the General Counsel to the Airport. His salary is paid entirely from the Airport's Enterprise Fund, a legally segregated account separate from the City's general fund.

Under two statutes, 49 U.S.C. §§ 47107(b) and 47133, as implemented by FAA Grant Assurance 25, all revenue generated by a federally obligated airport must be used exclusively for the Airport's capital or operating costs. The diversion of airport revenue to non-airport purposes is prohibited.

Because Martinez is paid through the Enterprise Fund, his attorney-client relationship is with the Airport, not with the City, the Mayor's office, or the Mayor's political appointees.

Martinez has a binding duty of loyalty to the Airport. He owes his professional judgment to the Airport and its leadership.

At all times, he has provided honest, well-reasoned legal advice and counsel, consistent with his obligations under the Colorado Rules of Professional Responsibility.

Similarly, Martinez's attorney-client privilege is between him and the Airport. The Airport holds the privilege. Only the Airport, acting through its leadership, can waive it. The City Attorney does not hold it.

2

The nature and scope of Martinez's attorney-client relationship with the Airport and the related attorney-client privilege are established under authority, including an expert opinion in airport law.

Currently, David Steinberger and Kevin Cain each serve on the Airport legal team as Assistant General Counsel.

Phil Washington, a Black man, is the Chief Executive Officer for the Airport.

Washington is a political appointee, having been appointed by former Mayor Michael Hancock.

## 1.  Overview of Facts

Beginning after May 2024, the City initiated a calculated chain of events targeting Martinez; essentially punishing him for doing his job as General Counsel for the Airport.

Nicole Doheny is the Chief Financial Officer for the Mayor.

Jeff Dolan is the Chief Strategist to the Mayor.

Miko Brown is the City Attorney.

Doheny, Dolan, and Brown are political appointees. Mayor Michael Johnston appointed them.

This case is not a typical employment dispute.

This action involves the federally obligated Airport, subject to federal statutes and regulations that mandate how the Airport must be run and funded. The Airport and City must comply with the Federal Aviation Administration's Grant Assurances, which bind the City as the Airport's sponsor and impose duties on the City and the Airport to meet all legal requirements and avoid severe financial penalties.

In this context, the City and its individual officials initiated and perpetrated a series of increasingly severe retaliatory and discriminatory actions against Martinez because he was doing his job: ensuring the City complied with all relevant laws.

These events involve the Mayor's top political appointees, Brown, the current City Attorney, Doheny, Dolan, Katie McLaughlin, the former Acting City Attorney  [collectively, the "Appointees"], pressuring and/or directing Martinez to:

(1) Act contrary to the required FAA rules and procedures for gaining approval of municipal transactions involving the transfer of Airport land.

(2) The land is Airport land and the Park Hill Golf Course property. These are the properties involved in the Mayor's real estate land swap deal involving a private developer, the Mayor's office, the Airport, the City Council, and the governing FAA statutes and regulations.

3

(3) Conceal material facts from the FAA regarding the land swap deal involving the Park Hill Golf Course land deal.

(4) Violate or ignore FAA's rules and, in doing so, expose the City to significant financial penalties.

(5) Reverse his well-reasoned legal opinion and advice regarding the Airport's financial and legal risks involved in the City's land swap real estate deal with a private developer, involving the Park Hill golf course.

(6) After his refusal to reverse his legal opinion, the City and Brown threatened him with discipline and implicitly threatened to fire him if he did not reverse his well-reasoned opinion.

(7) Admit his legally sound advice, counsel, and legal opinions on the land swap deal and the legal and financial risks were wrong.

(8) Start an improper investigation into Key Lime Airlines.

(9) Make false representations to the FAA about the reasons for the contemplated investigation into the airline.

(10) Change the initial false reason for the investigation to provide a substituted, second fabricated reason for the completed investigation.

(11) To destroy and/or not keep necessary records regarding the transactions and events involving the land deal.

(12) Provide a private citizen (private citizen one) and the private citizen on whose behalf private citizen one was acting (private citizen two), access to confidential, attorney-client privileged information to permit the private citizens to be involved in the legal affairs of the Airport, the Airport's transactions and concessions business dealings, and direct the actions of the Airport leadership and Airport legal team.

(13) Take the above-directed actions, which violate his responsibilities and duties under the Colorado Rules of Professional Responsibility and subject him to penalties, up to disbarment, for attorney misconduct.

(14) Join their politically motivated actions to remove Phil Washington from his CEO position; to "deal with him."

In response to the City's above actions, Martinez engaged in repeated protected activities by objecting to the City's above targeted actions.

Following or concurrent with Martinez's protected activities, the City subjected him to actions causing him to suffer ongoing harm.

4

On April 7, 2024, the Airport CEO and the previous CFO recommended a pay raise and an increase in Martinez's job classification. [Ex. 2]. The current Airport CFO confirmed the recommendation on December 22, 2025. *Id.*

On August 12 and 27, 2025, and September 2, 2025, Martinez brought the recommendation to Dolan's attention. [Ex. 3].

The recommendation was to change Martinez's current classification from an Executive Vice President ("EVP") at level EX-21 to an EX-22. The recommendation was based on Martinez performing the duties of an Airport EVP at the EX-22 classification level since June 2022,  while remaining classified at the same level. Martinez is the only EVP at the Airport who is not classified as EX-22.

The pay difference between an EX-21 EVP and an EX-22 EVP is about $48,000 per year.  The average EVP salary in 2024 was $273,337, but in 2026, Martinez's salary will be $225,358.56.

The City denied Martinez the recommended pay raise and job reclassification.

In the context of Martinez objecting to Brown's demeaning comments and threats, she dismissed his concerns by telling him, "If you want, get a noose and hang yourself."

The City and Brown repeatedly accused Martinez of obstructing and sabotaging City projects. The City and Brown relied on these fabricated conclusions to threaten disciplinary action and, implicitly, his job.

The City and Doheny directly disparaged and undermined Martinez with Peter J. Kirsh of Kaplan Kirsch [Kaplan firm], the country's oldest and largest dedicated airport law practice. The Airport regularly retains the firm as outside counsel. [1]

Mr. Martinez has a long, established professional and supportive relationship with Mr. Kirsch, whom he considers a mentor and friend. Throughout the events in dispute, Mr. Kirsch has been supportive of the quality and accuracy of Martinez's legal advice and well-reasoned opinions.

For 2025, the City gave Martinez the lowest evaluation of his career with the City. This was the first time he received a "development needed" rating on a performance element. [Ex. 4].

## 2.  Overview of Claims

Martinez has multiple compelling legal claims for discrimination and retaliation under:

    (1) Title VII of the Civil Rights Act of 1964, as amended, [Title VII], 42 U.S.C.
       §§  2000e–2000e-17.

---

[1] https://www.kaplankirsch.com/practices/airports/

(2)  42 U.S.C. § 1983 [Section 1983].

(3)  The First Amendment of the United States Constitution.

(4)  The Equal Protection Clause of the Fourteenth Amendment.

(5)  The Colorado Anti-Discrimination Act, as amended [CADA], and C.R.S. §§ 24-34-401 to 406.

(6)  42 U.S.C. § 1981 [Section 1981], asserted through Section 1983.

(7)  The False Claims Act, 31 U.S.C. §§ 3729–3733.

Martinez has a viable claim for third-party interference with continuing business relationships and a potential claim for wrongful discharge in violation of public policy. The above claims are not exclusive to Martinez's potential claims.

Under Section 1983, Section 1981, and the False Claims Act, Brown, Dolan, Doheny, and McLaughlin may be personally liable for back pay, front pay, compensatory damages, punitive damages, attorney fees, and costs.

Similarly, under CADA, any individual, including the named officials, leaders, supervisors, managers, and employees, can be personally and individually liable if they aid, abet, incite, compel, or coerce the doing of any discriminatory or unfair employment practice. C.R.S. § 24-34- 402(1)(e)(I)-(IV)(2024). *Morales v. L. Firm of Michael W. McDivitt, P.C.*, 641 F. Supp. 3d 1035, 1041 (D. Colo. 2022).

In addition to individual liability under CADA, individuals liable for violating CADA are not subject to CADA's damage limits/caps. [Ex. 5 (Order in *Jennifer Dunlap v. Investor's Realty, LLC)*].

The City's actions have caused Martinez to suffer a loss of wages, extreme stress, humiliation, fear, embarrassment, shame, anxiety, and severe damage to his career.

If this dispute is not resolved, Martinez will file (1) his lawsuit with the United States District Court for the District of Colorado, asserting his constitutional claims under Section 1983, his Section 1981 claim through Section 1983, and his False Claims Act [FCA] retaliation claim, and (2) a motion for a preliminary injunction to prevent the City, Brown, Dolan, and Doheny from continuing to retaliate against Martinez.

## 3.  Retaliation

We submit this document for compromise under the Federal and Colorado Rules of Evidence 408; however, this statement is protected activity under Title VII, CADA, Sections 1983 and 1981, as well as the FCA.

Under these statutes, the City, Brown, Doheny, and Dolan, and City officials, supervisors, managers, and employees are prohibited from continuing to retaliate against Martinez for submitting his claims herein.

6

This statement may be used in future proceedings against the City and the named individual officials for unlawful retaliation.

### 4. Period for Negotiation and Resolution

Mr. Martinez has given his professional and personal best in serving the airport. This matter has caused him needless stress and worry. Unfortunately, he has seen the City's and the Mayor's officials' reactions become more severe.

We are committed to resolving this matter efficiently through negotiation and a resolution, or through litigation.

We realize the issues discussed are serious. We will disagree on the facts and the law; however, resolving all issues will serve the interests of all parties.

We will work with you to resolve all claims and issues.

Because of the immediacy of the situation, we ask for the City to negotiate with us through March 24, 2026.  We provide this period to resolve every part of this dispute.

Also, we are open to agreeing and conducting private mediation with these provisions: (1) the City will pay the entire cost of the mediation, (2) Martinez will have no contact with Brown until resolution or an impasse, and (3) there will be no retaliation against Martinez.

## FACTS

## A.  THE GOLF COURSE LAND SWAP

### 1. The Deal

In May 2024, Martinez learned the Mayor's office wanted to trade land with a private developer, the owner of the Park Hill Golf Course.

The developer could no longer develop the golf course property because Denver voters rejected his proposed plan for the site.

Newly elected Mayor Johnston had promised to reacquire Park Hill Golf Course.

At this time, Deeanne Durfee, an attorney, was the City's Director of Municipal Operations.  Durfee told Martinez the land transaction was impossible to carry out. She asked for Martinez's opinion.

Martinez agreed with Durfee. He explained the transaction was a textbook example of a violation of a key FAA principle called "Revenue Diversion." The Revenue Diversion standard prevents a city that owns an airport from unjustly taking money or value from it.

Durfee told Martinez that Mayor Johnston wanted to close the deal by his first State of the City speech on July 22, 2024.

7

Also, Durfee and Martinez believed the 1988 County Intergovernmental Agreement [IGA] with neighboring communities prohibited the sale of this land and permitted only long-term leasing.

## 2. FAA  Revenue Diversion Rule

The FAA's revenue diversion rule prohibits cities from diverting airport-generated revenues to non-airport purposes. Under the rule, the City cannot use airport-generated revenue for any purpose other than the capital or operating costs of the Airport. Two federal statutes establish this requirement.

First, 49 U.S.C. § 47107(b) conditions federal grant eligibility on the City's assurance airport revenues will be used exclusively for airport purposes. Second, 49 U.S.C.  § 47133 imposes the same obligation directly on the City, the sponsor, independent of any grant agreement.

The FAA enforces these provisions through Grant Assurance 25, which implements the two statutes above. Grant Assurance 25 remains in effect without any expiration date for as long as Airport is used as a public-use airport. The City cannot negotiate around it.

Through its statutory and regulatory authority, the FAA has civil enforcement authority, including the power to impose severe measures, such as loss of federal grant eligibility, withholding of funds, and civil penalties equal to three times the amount of the illegal diversion, plus interest.

The revenue diversion rules impose a direct and affirmative duty on the Airport, its General Counsel, and its legal team to monitor, identify, and prevent the diversion of airport revenue to non-airport municipal purposes.

When Martinez identifies potential revenue diversion, he has a professional and legal duty to raise those concerns. Failure to do so exposes the Airport and the City to federal enforcement action and substantial, long-term financial penalties. [2]

## 3. The Land Swap Deal Activities by the Mayor's Political Appointees

In the Spring and Summer of 2024, Doheny and Dolan began conducting meetings and taking action to complete the proposed transaction to swap the golf course for some land at the Airport.

---

[2](1) Core Prohibition [49 U.S.C. § 47107(b)]; (2) Independent Statutory Restriction [49 U.S.C. § 47133 (direct statutory mandate that airport revenue may be used only for permitted airport purposes)]; (3) Prohibited Forms of Diversion [49 U.S.C. § 47107(k)], and (4) Enforcement and Penalties [49 U.S.C. §§ 47107(m)–(n), and 49 U.S.C. § 47111].

8

During this same period, Martinez held many meetings with his legal team, airport officials, and employees, addressing (1) the legal risks of land swaps with a sponsor City, (2) revenue diversion issues, and (3) the legitimate justification the City could provide to the FAA for buying or owning a golf course.

Martinez had many discussions with the Kaplan firm about the contemplated land swap.

As for the IGA agreement with surrounding local government entities and communities, Martinez led many discussions on the implications of the City's potential IGA violation. Martinez told Dolan it might require a vote of the people or obtaining a waiver from the IGA parties to change the IGA. To Martinez's knowledge, no waiver and no vote of the people occurred to change the IGA.

Despite Martinez engaging in extensive due diligence to protect the Airport and provide sound advice to Dolan and Doheny,  Kerry Tipper, the previous City Attorney, and other officials, Dolan and Doheny decided the Airport would sell the land to the City, via an internal book transfer,  and then, at the same time, swap the land with the developer for his golf course.

For any land transaction involving a City-owned airport, the FAA requires the Airport to complete a "743 Action" with the FAA.

In a 743 Action, the airport informs the FAA of its plans to sell real property and confirms (1) the plan complies with grant assurances, meaning the airport is receiving fair market value and the proceeds will remain with the airport, not be diverted to a general fund; (2)  the sale does not violate the revenue diversion rules under 49 U.S.C. §§ 47107(b) and 47133; and (3) the transaction does not create a safety problem.[3]

Concerning the golf course deal, the Airport's first Form 743 was sent to the FAA in October 2024 by Steinberger, an attorney on the Airport legal team. [4]

Before submitting the Form 743, Martinez and Steinberger raised several objections to City officials, including that filing the required Form 743 without a specific land parcel identified was premature and risky.

Martinez and Steinberger argued the City's choice of a particular parcel was necessary before moving forward. The developer selected the choice of the parcel, and Dolan communicated the developer's choice to the City and the Airport.

Despite this advice, Doheny directed Steinberger to file the Form 743.

---

[3] Section 743, FAA Reauthorization Act of 2024, Pub. L. No. 118-63.
[4] The Form 743 was sent to the Manager of the FAA's local district office, Jessee Lyman. Later, Martinez learned the form had been sent to an incorrect email address.

9

### 4.    Premature Announcement of Land Deal

From May 2024 through October 2024, Martinez frequently spoke with Kerry Tipper, the former City Attorney, and McLaughlin, including during their regular check-ins.

Martinez repeatedly explained that his legal team and Airport leadership felt increasing pressure from Doheny and Dolan to complete the swap, citing the risks of FAA revenue diversion and IGA hurdles for both the City and the Airport.

### 5.  The Concealment Directive

Dolan and Doheny structured the deal for the Airport to transfer land to the City, and the City would immediately swap it to the developer.

The FAA required the Airport to notify the agency and certify the appropriateness of the transaction.

After the real estate deal was announced, Kerry Tipper, the former City Attorney, told Martinez to tell Washington the Mayor preferred FAA not be told about the part of the deal involving the private developer.

Later, beginning in the summer before August 12, 2025, Doheny, more than once, told Washington and the Airport's attorneys,  "***The Mayor does not want FAA to know about the Westside step***."

Doheny's repeated directive was to conceal a material fact from a federal government agency with direct jurisdiction over the Airport and the City.

### 6. Premature Announcement of Real Estate Deal

In October 2024, Tipper took maternity leave and left the City in January 2025. After Tipper's absence, McLaughlin was appointed Acting City Attorney.

McLaughlin began attending regular meetings regarding the golf course land swap.

In January 2025, McLaughlin told the leadership of the City Attorney's office she had contacted Jenn Ridder, the Mayor's then Chief of Staff, about her interest in becoming the City Attorney.

On January 15, 2025, the Mayor announced at a press conference at the Park Hill Golf Course that the City had acquired the golf course to turn it into a public park.

At the time of the Mayor's announcement, (1) the necessary Purchase and Sale Agreement had not been signed, (2) the entire FAA Action 743 process was not finished, and (3) the City Council had not yet voted on the Purchase and Sale Agreement, which would not happen until May 2025.

10

### 7.  Interference with Martinez's and Airport's Relationship with Counsel

Regrettably, during this period, McLaughlin held meetings with the Kaplan firm without informing Martinez and Steinberger.

These actions posed a risk of reducing Martinez and Steinberger's credibility with the firm and kept them uninformed about issues directly under their authority, for which they had primary legal responsibility. [5]

### 8.  The Below-Market Appraisal

A key part of the FAA's Form 743 analysis is determining when the Airport sells property, the City must receive fair market value in an "arm's length transaction."

Doheny and her team, including City real estate employees, controlled the appraisal of the Airport land without Airport involvement.

The Airport's own data supported a higher value. The revenue diversion rules are designed to prevent the City from unilaterally setting the price on its own Airport's land.

Previously, the Airport had told the FAA in 2020 that the same land in issue was worth $3.25 sq/ft; however, the City's unilaterally controlled appraisals yielded values of $1.70 sq/ft in 2024 and then $1.65 sq/ft in 2025.  This resulted in an approximately 50% decrease in the value of the Airport's land transferred to the City.

This issue was central to Martinez's duties as General Counsel. He was very concerned the Mayor's office was sidelining the Airport in an appraisal for its land.

Martinez's concern about the revenue diversion, including the transaction being below market value, was the FAA "third rail" he had cautioned Dolan, Doheny, and other officials against.

In response to Martinez's objections and reasoned concerns, Doheny stated:

**The [Airport]  is a place, not a thing, under the City. And I am the CFO of the City, we own that land, and it's my call.**

Martinez again explained to Doheny that the federal government views the Airport as a distinct entity. The FAA takes this principle of distinct entities and the revenue-diversion rule, which includes the fair-market-value issue, very seriously.

Doheny and her colleagues ignored Martinez's advice.

---

[5] Starting February 6, 2025, new concerns arose about the land deal. The issue was how the developer's proposed development might interfere with "imaginary surfaces," layers of airspace the FAA needs to keep clear for safety.

11

### 9. The Order Not To Keep Records

On August 6, 2025, Acting City Attorney McLaughlin called Martinez at home at 7:09 p.m.

In the call, McLaughlin directed Martinez and his team not to keep records of the real estate transaction. She stated: "Keeping records would scream treble damages to the FAA." Martinez documented the call.

Martinez immediately called both of his two Assistant General Counsels, Steinberger and Cain, plus Washington, and directed them to always record and keep records of the real estate deal.

Later, Martinez told his team that if they ever feel like a deal or matter needs to be documented due to impropriety witnessed or for posterity's sake, they should always do so. And more importantly, if anyone, including himself, ever tells them not to keep a record of something, they absolutely should keep a record.

### 10. The 20-Acre Expansion

The developer selected the parcel for the land swap. The Mayor announced the deal at a press conference before the agreement was signed, before the FAA process was done, and before City Council voted.

When the Council voted, it approved a swap of 145 acres in May of 2025.

Later, the developer demanded an additional 20 acres.

On August 19-20, 2025, Martinez and Steinberger told McLaughlin they needed separate Council approval for the additional acreage. [Ex. 6].

Doheny's team called it "de minimis." City Councilman Flynn called the additional acres "more like 'de maximus.'" The City Council called it "disrespectful."

### 11. Application for City Attorney & Non-Selection

Martinez applied for the City Attorney position.

On July 18, 2025, a panel interviewed him. Dolan attended even though he was not on the panel.

Later, Martinez was one of three finalists. He interviewed with the Mayor and Jenn Ridder, the Mayor's former Chief of Staff. In the final interview, his goal was to tell the Mayor's Office, "The alarms are flashing red; we need you to fix this now."

In the interview, in response to the Mayor's question about how to improve the relationship between Doheny and Washington, Martinez gave his standard and repeated response: everyone needs to sit down and work out their differences because it's causing

12

many problems. He gave the analogy of children being hurt by noncommunicative parents in a divorce.

On July 30, 2025, Ridder told Martinez he was not selected. She told him, "The Mayor wanted [him] to specifically know that we are aware of all of the help you have provided to Jeff (Dolan) and Nicole (Doheny) at the Airport."

Brown became the City Attorney on  September 1, 2025.

Four days later, on September 5, 2025,  Martinez submitted a comprehensive memorandum to Brown, briefing her on the legal issues regarding the golf course real estate deal. [Ex. 7].

On September 8, 2025, Steinberger submitted a memorandum to Brown providing further analysis on the legal issues involved in the golf course land swap deal. [Ex. 8].

## 12.   FAA Scrutiny

On October 18, 2025, the local media ran an article about the land deal.

After the media reported the land was going straight to the developer, the FAA contacted the Airport's Chief Operations Officer, and Washington.

The FAA warned that future grants were at risk. The FAA also discovered the original filing had been sent to the wrong email address, without Martinez's knowledge.

When Martinez told Brown about this FAA scrutiny, she stated, "Well, they [Doheny and Dolan] can't say you didn't warn them."

However, in a meeting on the next day, Brown told Martinez, "You and David [Steinberger] should have done a better job communicating the risk to [Doheny and Dolan]."

 Later, Brown emailed Martinez and Washington, stating she wanted to be included in all FAA news and discussions going forward, along with Dolan and Doheny.

Brown's directive has the potential to improperly interfere with the attorney-client relationship between Martinez and Washington, as CEO, and the Airport, and to sacrifice their attorney-client privilege.

## 13.   Leadership Retreats

At a retreat on October 31, 2025, when a colleague jokingly asked if the Mayor wanted to "fire everyone," Brown looked right at Martinez: "Actually, I'm sure there's a few people he'd love to get rid of."

At another retreat, she spent over an hour publicly berating another Director in the City Attorney's office until the Director she was in tears, curled up in the fetal position.

13

### 14.  Martinez's First OHR Contact

On November 13, 2025, Martinez called the OHR representative for the City Attorney's Office, Chandra Lutz. He told her about the comments from Brown during the retreats and asked for her advice.

Lutz recommended Martinez file a grievance and stated, "I'd be careful with her and take it seriously."

Martinez did not file a grievance because he feared increased retaliation discrimination.

As discussed below, later, in January 2026, Martinez filed a complaint with OHR.

## B.  RETALIATION

### 1.  Sabotage & Obstruction Accusations

Starting in September 2025, right after Brown became City Attorney, the retaliation began.

On September 19, 2025, Martinez received a call from Peter Kirsch with the Kaplan firm.

Kirsch told him Doheny had called him and asked him to "yell at" Martinez. Kirsch also mentioned Doheny made "outrageous accusations" about Martinez "personally."

Martinez complained to Brown about Doheny's conduct.

Brown refused to address Doheny's conduct. Instead, she was upset with Kirsch, the outside lawyer, because he had told Martinez about Doheny's comments.

Martinez complained to Brown that two of his attorneys overheard her speaking to Dolan the prior week, in which Dolan stated:

**[Martinez and Steinberger] are actively sabotaging this transaction, and Mike (the Mayor) has taken note.**

When Martinez confronted Brown, she first denied it; then she called Steinberger an "obstructionist" and said she was "not quite at the point of getting rid of him yet."

From this point on, at every meeting but one, Brown told Martinez:

**You and David [Steinberger] need to fix the relationship with [Dolan and Doheny]. If you don't, something is going to happen.**

14

### 2. January 13, 2026. The OHR Complaint

On January 13, 2026, Martinez filed his OHR complaint, in which he discussed many of the events in issue and the retaliation he was receiving from Brown and other officials. [Ex. 9].

### 3. Key Lime Airlines

In late December 2025, the City Council rejected an ordinance to lease space to Key Lime Airlines, a small airline at the airport.

The Council opposed Key Lime's lease because the airline transported individuals who were subject to deportation based on their immigration status.

Before the Council's decision, the Airport legal team advised the Council of the FAA's position that discrimination against an airline is only permissible for safety reasons. An example of the Council receiving the Airport legal team's advice was Councilmember Sarah Parady acknowledging receipt of the legal advice and stating that she would still vote no on the lease. [6]

With this information, the Council voted against the lease.

### 4. FAA Scrutiny

Martinez and the Airport legal team's advice on Key Lime Airlines proved prescient.

On December 31, 2025, the FAA submitted a letter to Washinton. The FAA states:

The Federal Aviation Administration (FAA) is writing to express concerns regarding the recent action taken by the Denver City Council in regard to City Council Bill 1938 to deny approval of a proposed airport lease for Key Lime Air Corporation at Denver International Airport. Based on information currently available to the FAA, the stated rationale for the lease denial appears to be unrelated to airport operational, safety, or capacity considerations and instead is based on opposition to the tenant's aeronautical activities. [Ex. 11].

### 5. Events After FAA Notice

On January 2, 2026, Emily Garnett, the Mayor's Acting Chief of Staff, contacted Martinez to tell him Council President Amanda Sandoval wanted to speak with him, following a discussion among Garnett, Sandoval, and Angela Casias, the Mayor's Legislative Director, about the implications of the no vote.

---

[6] There is no Exhibit 10.

On Saturday, January 3, 2026, Sandoval called Martinez and asked a few questions about FAA Grant Assurance 22 and for some literature explaining the grant assurance program.

Martinez told Sandoval he read the transcript of the Council's vote and related discussion. He stated his opinion: voting down an airline agreement for any non-safety reason would be an enormous problem, and it seemed some Council members thought voting no would cost the Airport only a single grant, which was not correct.

Martinez emphasized the action could cost the City all grants going forward.

Sandoval asked him about the amount of money in issue. He replied, "That's for [City] Finance and Nicole Doheny to answer. I can only guess, and we have been told by Miko [Brown] that if we think Nicole would want to be involved in a matter, we need to make that known."

Brown had given the directive about Doheny's involvement to the entire City Attorney's Office on a town hall call.

## C. JANUARY 8-9, 2026: RETALIATION & DISCRIMINATION REACH CRITICAL LEVEL

On January 8–9, 2026, Brown's retaliation and discrimination against Martinez reached a critical point.  In meetings on these dates,  Brown stated to Martinez:

(1) He had "zero credibility" and was "full of shit."

(2) She repeatedly referenced a mystery email where she alleged Martinez offered to "kill the deal," in reference to the real estate land swap deal.

(3) Martinez did not know the document Brown was referencing. She did not show him the mail until a month later.

(4) The actual email was written nearly a year and a half before Brown was hired.

(5) Brown misreads the email. In the email, Martinez did not promise or offer to kill the deal.

(6) Giving Washington advice on how to prevent a transaction from occurring is exactly what FAA expects airport lawyers to give when a City proposes a deal that likely violates grant assurances and the law and exposes the Airport and City to penalties, including a vast amount of loss of revenue.

(7) Concerning the email that Martinez allegedly sent to Washington, Brown admitted she shared the email with Dolan. This action by Brown violated Martinez's attorney-client privilege at the Airport.

(8) Brown took an attorney-client communication between Martinez and his client, the Airport CEO, and handed it to a political operative to use against Martinez.

16

(9) She told Martinez to "Get a noose and hang yourself with it."

(10) She stated four times, "Maybe this isn't the place for you."

(11) She repeatedly demanded that Martinez "come clean" to Dolan and Doheny in writing about "**all the wrong you have done.**"

(12) She told Martinez, "If you can get on board with Dolan, Doheny, and me, then we can take care of [Washington] together."

## D. EVENTS AFTER OHR COMPLAINT.

On January 13, 2026, Martinez reported to the City Attorney's Office OHR representative that he believed Brown and the Mayor's Office were retaliating against him for doing his job and looking for a cause to get rid of him and Steinberger.

Since Martinez requested OHR assistance on January 13, 2026, Brown has: (1) accused him of poor management, (2) held meetings with his deputy but excluded him, then blamed him for not supervising said deputy on that matter, and (3) provided him with the lowest evaluation in his career.

On February 18, 2026, Laura Coburn, Director of Human Resources, met with Martinez and told him he would be separated from direct one-on-one contact with Brown due to Brown's inappropriate and escalating behavior towards him on February 11, 2026, after she was on notice that Martinez had submitted his concerns with her to OHR nearly a month earlier. [Ex. 12].

Despite OHR and Coburn's assurances that he would not have to interact with Brown, Brown has scheduled a one-on-one meeting with him on March 11, 2026.

## <u>LEGAL CLAIMS</u>

The discussion below addresses the claims Martinez may file at this time without any government immunity notice or exhaustion of administrative remedies.

### 1. First Amendment Retaliation

Martinez has a compelling First Amendment retaliation claim under 42 U.S.C. § 1983.

Martinez is prepared to file his First Amendment claim based on the retaliation he has received following his repeated refusals to participate in the politically motivated effort to remove Washington, the Airport CEO. The scope of this claim may expand before or during the lawsuit.

Martinez will name the City, Brown, Doheny, and Dolan as defendants in this claim.

The law is established: federal courts recognize that a civil service employee's refusal to participate in politically motivated employment actions can be protected speech under the First Amendment, particularly where the refusal resists inappropriate political influence over

17

non-political, merit-based civil service positions. See, e.g., *Blanford v. Dunleavy,* 566 F. Supp. 3d 969 (D. Alaska 2021); *Aiken v. Rio Arriba Bd. of Cnty. Comm'rs,* 134 F. Supp. 2d 1216 (D.N.M. 2000); *Brown v. Office of State Comptroller,* 456 F. Supp. 3d 370 (S.D.N.Y. 2020).

Martinez will meet the elements of his First Amendment retaliation claim. *See, e.g., Irizarry v. Yehia,* 38 F.4th 1282, 1288 (10th Cir. 2022)

First, Martinez engaged in protected First Amendment activity by refusing to participate in politically motivated or unlawful employment actions. *See, e.g. Blanford v. Dunleavy*, 566 F. Supp. 3d 969, 981-988. (D. Alaska 2021).

In *Blanford*, a state employee alleged retaliation after refusing to participate in politically driven employment decisions tied to a new administration's goals. The court held that the refusal, which communicated opposition to politicizing civil service processes, plausibly constituted protected First Amendment activity, allowing the claim to proceed past the pleading stage. 566 F. Supp. 3d 969, 981-988. (D. Alaska 2021).

*Blanford* explained that the infusion of politics into a non-political civil service job is a matter of public interest, and the plaintiff's actions on this issue were protected under the First Amendment. *Blanford,* 566 F. Supp. 3d 969, 990.

Martinez meets the second element of his claim because the City, Brown, Dolan, and Doheny subjected him to adverse employment actions that would chill a person of ordinary firmness from continuing to engage in the protected activity. *Irizarry,* 38 F.4th 1282, 1288.

The City, Brown, and the named officials subjected Martinez to a series of increasingly severe and materially adverse actions, including:

(1) Denying him the recommended pay raise and reclassification of his position, which had been recommended and approved by three Airport officials.

(2) Making disparaging statements to him and others, attacking his professional integrity and competence.

(3) Interfering with his ongoing professional relationships, including making damaging statements about him to a retained law firm with which he has a long-term positive professional relationship, a relationship that is necessary and benefits the Airport and the City.

(4) Making false accusations he was obstructing and sabotaging City initiatives.

(5) Dolan told Brown that Martinez was "actively sabotaging this transaction, and the Mayor has taken note." Dolan's statement branded Martinez as disloyal in the eyes of the Mayor's office.

(5) Demanding he make a false confession and/or reverse an honest, well-reasoned legal opinion.

18

(6) Demanding, through Brown, Martinez "come clean" to Dolan and Doheny, in writing, about "all the wrong you have done regarding" the golf course land sweep deal.

(7) Brown's demand placed Martinez in a virtual trap; either he confesses and risks violating his obligations under the Rules of Professional Responsibility, or he refuses and faces being disciplined or terminated for insubordination.

(6) Giving Martinez his first negative performance review and the lowest in his career as an attorney with the City, following years of positive reviews.

(7) Directly threatening him with an adverse job action.

(8) At every meeting but one, Brown told Martinez, "You need to fix the relationship with Dolan and Doheny. If you don't, something is going to happen."

(8) Excluding Martinez from his duties and withholding necessary information from him.

(9) Brown held Key Lime meetings with Steinberger, Martinez's Assistant General Counsel, while excluding Martinez.

(10) Then, accusing Martinez of not supervising Steinberger. [Ex. 13 & 14].

(11) Addressing him with an offensive racist trope by telling him, "You can get a noose and hang yourself."

(10) Further threatening his job status, i.e., Brown told him four times: "Maybe this isn't the place for you."

Finally, Martinez will meet the third element of causation: his protected activities were a substantial or motivating factor in the employer's adverse action. *Irizarry,* 38 F.4th 1282, 1288.

Following his resistance to "get" Washington, his other complaints about compliance, and his direct objections to Brown and OHR about how he was treated, the adverse actions continued and escalated.

### 1. Three Additional Section 1983 Claims

Martinez has three more Section 1983 claims he may file immediately if negotiations fail.

(1) Race Discrimination under the Equal Protection Clause of the Fourteenth Amendment.

(2) Retaliation under the Equal Protection Clause of the Fourteenth Amendment.

(3) Race Discrimination Under Section 1981, asserted through Section 1983.

19

In these claims. Martinez will name the same defendants discussed above: the City, Brown, Dolan, and Doheny.

## 2. Section 1983 and Section 1981 Remedies

Martinez will seek the full scope of remedies under Section 1983 and Section 1981.

If Martinez remains employed at the Airport, he may recover the loss of his pay raise and benefits, a reclassification of his position, compensatory damages against the City and Brown, Doheny, and Dolan, the individual defendants, attorney fees, and costs.

If Martinez is terminated or constructively discharged, he will be entitled to front pay.

### (1) Compensatory Damages

Mr. Martinez may recover compensatory damages against the City, Brown, Doheny, and Dolan.

Courts treat First Amendment violations as special, requiring protection of First Amendment rights and applying expansive approaches to defining and awarding compensatory damages. This approach applies to constitutional equal protection, discrimination, and retaliation claims, as well as Section 1981 claims.

Compensation in cases involving constitutional rights should not be approached in a miserly fashion. It is in the public interest that there is a spacious approach to a fair compensatory award for denial or curtailment of the right. [internal citation and quotation omitted]. *Evans v. Fogarty*, 241 F. App'x 542, 562 (10th Cir. 2007).

In Coates v. Adams County [Civil Action No. 1:20-cv-01936-STV, (D.Colo.)], three plaintiffs claimed First Amendment retaliation related to their employment. On January 28, 2025, the Coates jury ruled in favor of the plaintiffs, awarding each of the four plaintiffs $818,750.00 in compensatory damages for emotional distress. [Exhibit # 15 (Court Order on equitable relief)].

### (2) Punitive Damages

An award for punitive damages against Brown, Doheny, and Dolan is realistic and foreseeable.

In *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1112 (10th Cir. 2004), a First Amendment retaliation employment case, the court found the award of punitive damages proper where "the jury found [defendants] were recklessly or callously indifferent to Ms. Hardeman's federally protected free speech and free association rights."

In *Hardeman,* the plaintiff sued the City of Albuquerque, the former Mayor, and her former supervisor, alleging violations of her First and Fourteenth Amendment rights and seeking damages under 42 U.S.C. §§ 1981 and 1983.

20

Plaintiff Hardeman alleged she was terminated from her employment because of her race and/or because she exercised her First Amendment free speech rights. 377 F.3d 1106, 1109.

The *Hardeman* jury found in favor of the plaintiff and awarded back pay, front pay, compensatory damages, and punitive damages against the former Mayor and her former supervisor. 377 F.3d 1106, 1112.

Regarding punitive damages, the jury awarded over $1 million against the former Mayor and a separate $1 million award against her former supervisor. These punitive damages awards were against the former Mayor and former supervisor in their individual capacities. 377 F.3d 1106, 1112.

### 3. False Claims Act (31 U.S.C. § 3730)

### (1) Overview

The False Claims Act [FCA], 31 U.S.C. §§ 3729–3733, is the federal government's primary tool for recovering money lost to fraud.

The Act provides for recovery when any person knowingly submits, or causes to be submitted, a false or fraudulent claim for payment to the United States government, or knowingly makes a false record or statement material to such a claim. 31 U.S.C. § 3729(a)(1)(A)–(B).

The Act covers "reverse false claims," situations in which a person acts improperly to avoid paying money owed to the government. 31 U.S.C. § 3729(a)(1)(G).

Martinez's most viable and immediate FCA claim is a retaliation claim under 31 U.S.C. § 3730(h).[7]

Any employee discharged, demoted, suspended, threatened, harassed, or otherwise discriminated against because of lawful acts to further an FCA action, or other efforts to stop violations, is entitled to "all relief necessary" to be made whole: reinstatement, double back pay with interest, special damages, and attorney's fees. 31 U.S.C. § 3730(h)(1)–(2).

There is no statutory cap on compensatory damages under 31 U.S.C. § 3730(h).

Courts interpret the statutory "special damages" to include compensatory damages. *See Neal v. Honeywell Inc.*, 191 F.3d 827, 834–35 (7th Cir. 1999).

---

[7] The second type of claim under the FCA is a qui tam action, where a private citizen, called a relator, files a civil action in the name of the United States. See 31 U.S.C. § 3730(b).

21

### (2)    <u>Martinez Meets the Elements of His FCA Retaliation Claim</u>

Martinez meets the elements of his FCA retaliation claim. See, e.g., *United States ex rel. Barrick v. Parker-Migliorini International*, 79 F.4th 1262, 1270 (10th Cir. 2023).

First, Martinez engaged in protected activity under the FAC.

Martinez engaged in lawful acts to further an FCA action or other efforts to stop violations. The statute does not require him to exhaust his administrative remedies or file a qui tam complaint.

Martinez raised many FCA-protected internal compliance complaints about previously described issues and warned his superiors and the Mayor's office about the potential, punitive legal consequences of their actions and decisions.

Martinez meets the second element because the City, Dolan, Doheny, and Brown had actual knowledge of Martinez's concerns, objections, warnings, and complaints.

Finally, the City, Brown, Doheny, and Dolan subjected Martinez to escalating retaliatory adverse actions.

### <u>CONCLUSION</u>

Martinez and this office are committed to asserting their claims through every forum to achieve a just and fair result. His claims will survive a motion to dismiss and a motion for summary judgment.

We seek to reach an agreement by March  24, 2026.

Please call me with your comments or questions.

Thank you for your professional cooperation.

Sincerely,

*Steven L. Murray*

Steven L. Murray
MURRAY LAW, LLC

22